IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | | |
|---|---|---|
| JOE COMES, RILEY PAINT, INC., an Iowa corporation, SKEFFINGTON'S FORMAL WEAR OF IOWA, INC., an Iowa corporation, PATRICIA ANNE LARSEN, and MIDWEST COMPUTER REGISTER CORP., an Iowa Corporation, | : : : : | NO. CL82311 |
| Plaintiffs, | : | |
| vs. | : | |
| MICROSOFT CORPORATION, a Washington corporation, | : : | FOURTH AMENDED PETITION |
| Defendant. | : | |

Plaintiffs, for their Class Action Complaint, by and through counsel, on behalf of themselves and all others similarly situated, on information and belief formed after an inquiry reasonable under the circumstances, allege against Microsoft Corporation ("Microsoft"), as follows:

## SUMMARY OF THIS ACTION

1.     Plaintiffs bring this class action under the laws of Iowa for damages sustained as a result of Microsoft's anti-competitive and monopolistic practices in the conduct of trade or commerce.  Specifically, Plaintiffs challenge those practices that Microsoft used—and continues to use—to prevent and destroy competition and to unlawfully acquire and maintain monopoly power.  Microsoft has restricted trade in the relevant software markets, resulting in substantial harm both to competition and to the ultimate consumers in those markets.



EXHIBIT
B

1

2.     Microsoft used its illegal monopoly power to raise prices to supra-competitive levels in the following product markets:

a.     the licensing of Intel-compatible personal computer ("PC") operating system software; and

b.     the licensing of Intel-compatible PC applications software, including word processing and spreadsheet software.

3.     These claims are prosecuted by two Classes: the "Microsoft Operating Systems Software Class," which consists of Iowa indirect purchasers of Microsoft MS-DOS or Windows operating system software; and the "Microsoft Applications Software Class," which consists of Iowa indirect purchasers of Microsoft applications software, including Word and Excel, that is compatible with Microsoft operating system software.   The particular Microsoft products included in these Classes are set forth below.

4.     The purpose and effect of Microsoft's illegal conduct has been to deny purchasers of Microsoft operating systems and applications software at a competitive price and free choice among competing software products, as well as to deny them the benefit of software innovation. The lack of free choice and the denial of benefits of software innovation include, *inter alia:* (a) Microsoft's products purchased by Plaintiffs and Class members would have been technologically superior to those actually purchased in the absence of its illegal conduct; (b) Plaintiffs and Class members were damaged by virtue of the fact that Microsoft increased end user license agreement restrictions after gaining monopoly power; and (c) Plaintiffs were damaged because of the degradation of their computers caused by Microsoft's products which included problems such as drained memory, decreased speed, and an increased incidence of security breaches and bugs.  Microsoft's illegal conduct has stifled, and continues to stifle,

innovation, variety, quality and safety of computer software, and unreasonably and significantly limited the choices of Iowa consumers.

5.     As indirect purchasers of the relevant Microsoft software, Plaintiffs and Class members are therefore entitled to recover damages for the difference between a competitive price for the relevant software and the monopoly price that they paid for Microsoft's products and for their injury from the lack of free choice and the denial of benefits of software innovation and for damages for breaches of security by reason of Microsoft's illegal conduct.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to the Iowa Competition Law, Iowa Stat. § 553.1 *et seq.* This Court also has jurisdiction pursuant to Iowa Stat. § 617.3 over Microsoft because Microsoft is authorized to conduct—and in fact does conduct—substantial business in the State of Iowa. Microsoft has sufficient minimum contacts with Iowa, or otherwise intentionally avails itself of the consumer markets within Iowa through the promotion, sale, marketing and/or distribution of its products in Iowa, to render the exercise of jurisdiction by the Iowa courts permissible under traditional notions of fair play and substantial justice.

7.     This complaint is not based upon federal law or any federal question. No claim for relief is made under federal law. The amount in controversy for each named class representative and each absent class member does not exceed, inclusive of interest, fees and costs, the sum or value of $75,000. As the federal courts do not have subject matter jurisdiction over the claims asserted herein, this action is not subject to removal under 28 U.S.C. § 1441.

8.     Venue is proper in this county, pursuant to Iowa Stat. § 616.14 as the acts upon which this action is based occurred in part in this county. Certain of the named Plaintiffs and numerous Class members reside in this county, and purchased Microsoft operating system

software and applications software (and were thereby injured) in this county. Microsoft received substantial compensation and profits from sales of such products in this county, and therefore Microsoft's liability arose in part in this county.

## THE PARTIES

9.    Plaintiff Joe Comes is a citizen and resident of Polk County, Iowa. Mr. Comes purchased a Gateway Solo Computer directly from Gateway, Inc. The computer came with Microsoft Windows 98, Microsoft Word, and Microsoft Excel pre-installed.

10.    Plaintiff Riley Paint, Inc. is a for-profit corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Burlington, Iowa. Over the years, Riley Paint has purchased relevant versions of Microsoft operating systems and applications software either pre-installed on Intel-compatible PCs or otherwise.

11.    Plaintiff Skeffington's Formal Wear of Iowa, Inc. is a for-profit corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Des Moines, Iowa. Over the years, Skeffington's has purchased relevant versions of Microsoft's operating systems and applications software either pre-installed on Intel-compatible PCs or otherwise.

12.    Plaintiff Patricia Anne Larsen is a citizen and resident of Clay County, Iowa. Ms. Larsen has purchased relevant versions of Microsoft operating systems and relevant applications software either pre-installed on Intel-compatible PCs or otherwise.

13.    Plaintiff Midwest Computer Register Corp. is a for-profit corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Hampton, Iowa. Over the years, Midwest Computer has purchased relevant versions of Microsoft operating systems and applications software either pre-installed on Intel-compatible PCs or

4

otherwise.

14.     Defendant Microsoft is a for-profit corporation organized and existing under the laws of the State of Washington.   Microsoft's principal place of business is located at One Microsoft Way, Redmond, Washington.   Since its inception, Microsoft has focused primarily on developing and licensing computer software.   Microsoft is the leading supplier of operating systems, word processing, spreadsheet, and office suite software for personal computers. Microsoft operating system software is pre-installed on more than ninety percent of all new Intel-compatible PCs sold.   Microsoft markets and licenses personal computer operating system software for personal computers throughout the United States, including the State of Iowa. Microsoft is authorized to conduct—and in fact does conduct—substantial business in Iowa.   The facts regarding Microsoft that are set forth below had a direct effect in the State of Iowa as to monopoly price that Plaintiffs and all others similarly situated individuals paid as end user licensees of Microsoft operating system and applications software.

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs bring this action pursuant to Iowa Rules of Civil Procedure 1.261 on behalf of themselves and on behalf of the two Classes identified below.

16.     The "Microsoft Operating Systems Software Class" consists of Iowa indirect purchasers of Microsoft operating system software.   For purposes of this class, "Microsoft operating system software" means any full or upgrade version of Microsoft MS-DOS Windows operating system software intended for use on Intel-compatible personal computers including, without limitation, MS-DOS, Windows 3.1, Windows for Workgroups 3.11, Windows 95, Windows 98, Windows 98 Second Edition, Windows Millennium Edition (Windows Me), Windows NT Workstation 3.5, Windows NT Workstation 4.0, Windows 2000 Professional,

5

Windows XP Professional and Windows XP Home Edition, and Windows XP Media Center Edition operating system software. For purposes of this class, "Microsoft Operating Systems Software Class" means a person or entity who, at the time of purchase, resided in or was incorporated in Iowa who, on or after May 18, 1994, was an indirect purchaser of Microsoft operating system software, and who did not purchase Microsoft operating system software for the purpose of resale.

17.    The "Microsoft Applications Software Class" consists of Iowa indirect purchasers of Microsoft applications software which is compatible with Microsoft operating system software. For purposes of this class "Microsoft applications software" means any full or upgrade version of Microsoft Word or Microsoft Excel, or any software in which Word or Excel are included in whole or in part, such as Microsoft Office or Microsoft Works Suite. For purposes of this class, "Microsoft Applications Software Class" means a person or entity who at the time of purchase resided in or was incorporated in Iowa who, on or after May 18, 1994, was an indirect purchaser of Microsoft applications software and who did not purchase such Microsoft applications software for the purpose of resale.

18.    Both Classes exclude Microsoft and its co-conspirators, their parents, subsidiaries, affiliates, officers, directors and employees. Also excluded are any federal, state or local governmental entities, and any judge or judicial officer presiding over this matter, judicial staff, and the members of their families.

19.    The named Plaintiffs, as indirect purchasers of Microsoft operating systems software, are representatives of an ascertainable class (Microsoft Operating Systems Software Class) that is comprised of Iowa indirect purchasers of Microsoft operating system software on or after May 18, 1994, and who did not purchase the software for the purpose of resale.

20.    The named Plaintiffs, as indirect purchasers of Microsoft Word or Excel (Microsoft Applications Software Class) are representative of an ascertainable class (Microsoft Applications Software Class) that is comprised of Iowa indirect purchasers of Microsoft applications software who purchased their Microsoft software on or after May 18, 1994, and who did not purchase it for the purpose of resale.

21.    Plaintiffs are informed and believe (and on that basis allege) that the memberships of the two Classes likely number in the hundreds of thousands of individuals and businesses, the exact number being known to Microsoft. The Classes are therefore so numerous that joinder of all members is impracticable. Joinder is also impracticable because of the geographic diversity of the members of the Classes and because of the need to expedite judicial relief.

22.    There are questions of law and fact common to each of the Classes. Such common questions include, but are not limited to:

a.    whether Microsoft has, at all relevant times, possessed monopoly power in the markets for Intel-compatible PC operating systems, word processing and spreadsheet software;

b.    whether Microsoft unlawfully and willfully obtained—and has unlawfully and willfully maintained—its monopoly power by anti-competitive and exclusionary conduct;

c.    whether the alleged conduct by Microsoft violates the Iowa Competition Law, Chapter 553, Code of Iowa, 1997;

d.    whether Microsoft's unlawful conduct has caused legally cognizable injury to each Class by increasing, maintaining, or stabilizing the prices that Plaintiffs and the Class members have paid for Microsoft software above competitive levels

7

and/or by denying them a free choice in a competitive market, as well as the benefits of software innovation;

e.    whether Microsoft unlawfully tied its browser, Microsoft Internet Explorer, with the Windows software; and

f.    whether Plaintiffs and the Class members are entitled to damages for their injuries.

23.    There is a well-defined community of interest in the questions of law and fact involved concerning the parties to be represented. The named Plaintiffs' claims are typical of the claims of absent Class members. Their claims fairly encompass the claims of absent class members. Moreover, the named Plaintiffs and absent Class members are similarly situated and have been harmed by the same course of unlawful conduct alleged herein.

24.    It is further appropriate to proceed with this action on behalf of the Classes because:

a.    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for Microsoft;

b.    as a practical matter, adjudications with respect to individual members of the Classes would be dispositive of the interests of the other members not parties to the adjudications, and/or would substantially impair or impede their ability to protect their interests; and

c.    the questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is

superior to other available methods for the fair and efficient adjudication of this action.

25.     Plaintiffs have retained lawyers who are experienced litigators. Included in the group is very substantial class action experience and expertise. The lawyers have agreed to advance the costs of the out-of-pocket expenses of this litigation and have the ability to do so.

## DEFINITIONS

The following definitions are provided to explain terms used herein:

26.     "Applications" are software programs that perform specific user-oriented tasks. For example, Microsoft Word word processing software and Microsoft Excel spreadsheet software are applications. Applications programs are typically written to run on a particular operating system and cannot run on other operating systems unless the developer "ports" the program to the other operating system.

27.     "Application Programming Interfaces" or "APIs" are hooks through which the developer of an application can connect to code in an operating system or other software program to allow the application program to use the services of that operating system or program.

28.     A "Browser" is a software application that allows a user to navigate the Internet and to select, retrieve and view information located on the World Wide Web.

29.     "Conclusions of Law" are the legal conclusions dated April 3, 2000 by the District Court in *United States v. Microsoft Corp.*, Civ. No. 98-1232 and Civ. No. 98-1233 (D. D.C.), as affirmed in part by the United States Court of Appeals for the District of Columbia Circuit. *See United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000), *aff'd in part*, 253 F.3d 34 (D.C. Cir. 2001).

Case 4:05-cv-00562-REL-RAW   Document 1-4   Filed 10/13/05   Page 10 of 30

30.    "Findings of Fact" are the findings dated November 5, 1999 by the District Court in *United States v Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999). These Findings of Fact are incorporated herein as if here fully set forth.

31.    "Graphical User Interface" or "GUI" is a type of environment that represents programs, files, and options by means of icons, menus, and dialog boxes on the screen. The user can select and activate these options by pointing and clicking with a mouse or, often, with the keyboard. GUI's have characteristics of both application and operating system software.

32.    "Independent Software Vendors" or "ISVs" are firms (including Microsoft) that develop applications and other software. They are "independent" in as much as they are not part of a vertically integrated hardware and software company (e.g., Apple Computer, which manufacturers Macintosh computers and also develops the MacOS operating system software).

33.    An "Intel-compatible PC" is a computer designed to function with Intel's x86 families of microprocessors or with compatible microprocessors manufactured by Intel or other firms (e.g. Advanced Micro Devices or VIA Technologies). Microsoft's Windows operating system is an example of an operating system that runs on x86-compatible PCs. Operating systems designed to run on x86-compatible PCs will not function on PCs designed around other microprocessor architectures, such as Macintosh computers (which use Motorola and IBM PowerPC processors), nor will an operating system designed for a non-x86-compatible PC function on an x86-compatible one.

34.    The "Internet" is a global electronic network that links many millions of computing devices together, allowing the computers to exchange information over telephone wires, dedicated data cables, and wireless links. The Internet links PCs by means of servers, which run operating systems and applications designed for servicing a network environment.

35.   "Internet Access Providers" or "IAPs" are commercial firms that connect users, companies and other organizations to the Internet. PCs typically connect to the Internet through the services of IAPs, which generally charge subscription fees to their customers in the United States.

36.   "Internet Content Providers" or "ICPs" are persons or companies that provide content on the Web. The content consists principally of web pages that may incorporate any combination of text, graphics, audio and video content, software programs, and other data.

37.   "Internet Service Providers" or "ISPs" are a type of Internet Access Provider, such as Earthlink or Speakeasy that offer Internet access.

38.   "Middleware" is software that "sits" between two or more types of software and translates information between them. Middleware generally sits between an application and an operating system, and takes advantage of the APIs of the underlying operating system while also exposing its own APIs for applications that run on top of the middleware.

39.   An "On-line Service" or "OLS" generally offers access to an online community of users along various services and an array of proprietary content and, optionally, Internet access. America Online ("AOL") and the Microsoft Network ("MSN") are two examples.

40.   An "operating system" is software that controls the allocation and use of computer resources (such as central processing unit time, main memory space, disk space, and input/output channels). In a personal computer, the operating system allows the various components of the PC to communicate and function with each other. It also acts as a "platform" to support the functions of software application programs.

41.   "Original Equipment Manufacturers" or "OEMs" are companies whose business may include the manufacture, assembly, development and sale of personal computers (e.g., Dell,

Gateway, and Hewlett Packard/Compaq). OEMs typically purchase hardware components (e.g., processors, motherboards, hard drives, graphics cards) from various third-party vendors and assemble those components into PCs. OEMs also generally preinstall software on their systems, including an operating system and often times applications software as well.

42.     A "personal computer" ("PC") is a digital information processing device designed for use by one person at a time. A typical PC consists of central processor components (e.g. a microprocessor and main memory) and mass data storage (such as a hard disk) along with certain peripheral input/output devices (including a monitor, a keyboard and mouse) and an operating system.

43.     "Platform" is used in the software industry to describe software that provides features or services that can be used by software applications. Applications typically "run on top" of the operating system and draw upon the services that the operating system's "platform" provides.

44.     The "World Wide Web" or "Web" is a massive collection of digital information resources stored on servers throughout the Internet.

45.     A "Web client" is software that, when running on a computer connected to the Internet, sends information to and receives information from Web servers throughout the Internet. Web clients and servers transfer data using a standard known as the Hypertext Transfer Protocol ("HTTP").

46.     A "Web browser" is a type of Web client that enables a user to select, retrieve, and perceive resources on the Web. In particular, Web browsers provide a way for a user to view hypertext documents and follow the hyperlinks that connect them, typically by moving the cursor over a link and depressing the mouse button. Although certain Web browsers provided

graphical user interfaces as far back as 1993, the first widely popular graphical browser distributed for profit, called Navigator, was brought to market by the Netscape Communications Corporation in December 1994. Microsoft introduced its browser, called Internet Explorer, in July 1995.

### RELEVANT MARKETS

#### The Relevant Product Markets

47.    At all material times, Microsoft has had monopoly power in the following product markets:

a.    The licensing of Intel-compatible personal computer ("PC") operating system software; and

b.    The licensing of Intel-compatible PC applications systems software, including word processing, spreadsheet, and office suite software.

#### The Relevant Geographic Market

48.    At all material times, the relevant geographic market for the class action claims asserted for the relevant product markets is the State of Iowa.

#### Intel-Compatible PC Operating System Software

49.    For the purposes of this action, the Intel-compatible PC operating system software market consists of operating systems for use on PCs based on Intel's x86/Pentium family of processors. At all relevant times, no other product has duplicated or fully substituted for the operating system.

50.    Throughout the Class Period (May 18, 1994 to the date of trial), Microsoft has marketed a variety of personal computer operating systems, including but not limited to MS-DOS, Windows 3.1, Windows 3.11 for Workgroups, Windows NT 3.5 Workstation, Windows

13

95, Windows 98, Windows 98 SE, Windows NT 4.0 Workstation, Windows Me, Windows 2000 Professional, Windows XP Home and Windows XP Professional.

51.   Because of the complex interactions between operating system software, applications software and the hardware components of a personal computer, an operating system written for one microprocessor architecture typically will not work on another class of microprocessor without significant modification.   Accordingly, OEMs and personal computer users do not consider an operating system that runs a non-Intel-compatible PC to be an effective substitute for an operating system that runs an Intel-compatible PC.

52.   The inability of server operating systems, non-Intel compatible PC operating systems, information appliances, network computers, server-based computing and middleware generally to provide a reasonable substitute for Microsoft's operating systems or to discipline its monopoly power is set forth in the Findings of Fact at ¶¶ 19-32.   It would be prohibitively expensive for a new Intel-compatible operating system to attract enough developers and consumers to become a viable alternative to a dominant incumbent in less than a few years. Findings of Fact at ¶ 31.

53.   Microsoft distributes its operating system software through two different channels: the OEM channel and the "finished goods" channel.   (On information and belief, Microsoft does not recognize any other channels in its day-to-day business activities.)   The overwhelming majority of Microsoft's operating systems software is distributed through the OEM channel. In 1997, for example, the OEM channel accounted for 87.6 percent of all copies of Windows operating system software sold that year.   Because a personal computer can perform virtually no useful tasks without an operating system, OEMs consider it a commercial necessity to install operating system software on nearly all of the PCs they sell.   Moreover, OEMs and

Microsoft both recognize that sellers of Intel-compatible PCs have no commercially viable substitute for Windows. For example:

   a. a Packard Bell executive testified in the most recent government antitrust action against Microsoft (detailed further below) that there was no commercially feasible operating system alternative to Windows 98;

   b. a Micron PC executive asserted in the same action: "I am not aware of any other non-Microsoft operating system software product to which Micron could or would turn as a substitute for Windows 95 at this time";

   c. a Hewlett-Packard executive testified in the government action that "[a]bsolutely there's no choice" except to install Windows on Hewlett-Packard's personal computers; and

   d. a Gateway executive testified in that action that Gateway had to install Windows because "[w]e don't have a choice." This same executive also testified that a commercially viable alternative to Windows "would drive prices lower" and promote innovation.

   e. Because there is no realistic commercial alternative to Microsoft operating systems for Intel-compatible PCs, OEMs consider it—and have considered it at all relevant times—a necessity to install MS DOS or Windows on nearly all of their PCs.

**Relevant Market for Intel-Compatible PC Word Processing Software**

54. For purposes of this action, the relevant market for Intel-compatible PC word processing software consists of applications software for performing word processing functions which runs on Microsoft operating systems. At all relevant times, no other product has

duplicated or fully substituted for word processing software.

55.     Microsoft sells Microsoft Word largely as part of Microsoft's "Works" and "Office" software suites.   Some personal computer end users also demand word processing software separately for installation on their personal computer at the time of purchase.  As with Microsoft's operating systems software, Microsoft Word reaches end users through the OEM and finished goods channels.

### Relevant Market for Intel-Compatible PC Spreadsheet Software

56.     For purposes of this action, the relevant market for Intel-compatible spreadsheet software consists of applications software for performing spreadsheet functions which runs on Microsoft operating systems. At all relevant times, no other product has duplicated or fully substituted for spreadsheet software.

57.     Microsoft sells Microsoft Excel largely as part of Microsoft's Office software suite.   Some personal computer end users also demand spreadsheet software separately for installation on their personal computer at the time of purchase.  As with Microsoft's operating systems and word processing software, Microsoft Excel reaches end users through the OEM and finished goods channels.

### MICROSOFT'S MONOPOLY POWER IN THE RELEVANT MARKETS

### Microsoft's Monopoly Power in the Operating Systems Market

58.     Since the mid-1980s, Microsoft has dominated the operating system software market.  For example, in the United States, its market share at times has exceeded 95 percent. Beginning in the late-1980s and continuing through the present, Microsoft engaged in a series of predatory acts designed to, and which did, eliminate competition and prevent entry in the operating system market.  Software companies offering superior operating systems and/or lower

16

prices, namely, Digital Research, Inc. ("Digital Research") and International Business Machines ("IBM"), were not able to compete with Microsoft because of Microsoft's unlawful conduct. Microsoft has had no significant competitor in the operating system market since Digital Research and IBM were eliminated as meaningful competitors in 1994. In addition, Microsoft has possessed a dominant and persistent share of the Iowa market for Intel-compatible PC operating system software. During most of the Class Period, Microsoft's share of this market has been at least 95 percent (extrapolating from Microsoft's share of the United States market for Intel-compatible PC operating system software).

59.    Throughout the Class Period, Microsoft has had monopoly power in the relevant market for operating systems. Findings of Fact of ¶ 33. Microsoft can and has exercised this power by charging a price for its Intel-compatible PC operating system software that is substantially above that which could be charged in a competitive market, and it can and has done so for a significant period of time without losing business to competitors.

### Microsoft's Monopoly Power in the Word Processing Applications Market

60.    Microsoft has possessed a dominant, persistent and increasing share of the Iowa market for Intel-compatible PC word processing applications software through its Microsoft Word product, which is most often bundled in its Office suite. By the mid-1990s, Microsoft's share of that market in the United States exceeded 90%. Microsoft's market share in Iowa is similar, on information and belief.

61.    It would be prohibitively expensive for new Intel-compatible word processing applications software to attract enough consumers to become a viable alternative to a dominant incumbent in less than a few years.

62.    Throughout the Class Period, Microsoft has had monopoly power in the relevant

17

market for word processing applications software. Microsoft can and has exercised this power by charging a price for its Intel-compatible PC word processing applications software that is substantially above that which could be charged in a competitive market, and it can and has done so for a significant period of time without losing business to competitors.

### Microsoft's Monopoly Power in the Spreadsheet Applications Market

63.     Microsoft has possessed a dominant, persistent and increasing share of the Iowa market for Intel-compatible PC spreadsheet applications software through its Microsoft Excel product, which is most often bundled in its Office suite. By the mid-1990s, Microsoft's share of that market in the United States exceeded 90%. Microsoft's market share in Iowa is similar, on information and belief.

64.     It would be prohibitively expensive for new Intel-compatible spreadsheet applications software to attract enough consumers to become a viable alternative to a dominant incumbent in less than a few years.

65.     Throughout the Class Period, Microsoft has had monopoly power in the relevant market for spreadsheet applications software. Microsoft can and has exercised this power by charging a price for its Intel-compatible PC spreadsheet applications software that is substantially above that which could be charged in a competitive market, and it can and has done so for a significant period of time without losing business to competitors.

### SOFTWARE DISTRIBUTION SYSTEM

66.     Microsoft considers its software to be its exclusive intellectual property. Consequently, as stated by Microsoft, it "does not technically 'sell' the software to anyone." Rather, it "licenses the software for specified purposes only." Affidavit of Robert Vellone, dated March 24, 2000, filed in *Precision Billing Services, Inc. v. Microsoft Corp.*, No. 99-896-GPM

18

(S.D. Ill.), ¶ 6. With regard to operating system software, Microsoft grants licenses to OEMs that permit them to pre-install it on PCs sold to end-users, while Microsoft grants different licenses to end-users that permit them to use the software on the PCs they purchase. The terms of Microsoft's written licenses are dictated and drafted solely by Microsoft.

67. Microsoft distributes its software licenses in the United States and worldwide through multiple channels. Early on, Microsoft recognized the OEMs, such as Dell and Compaq, as the single, most important channel for distribution of operating system and applications software licenses. Microsoft intentionally used its monopoly power in the operating system market to capture, dominate, and exclusively control the OEM distribution channel to the exclusion of ISVs. As a result, Microsoft's captive OEM channel functions as Microsoft's distributor for the large majority of all Microsoft operating system licenses with end-users of PCs. The remainder of Microsoft's software licenses are offered to end-users through retailers, such as CompUSA and Staples, other distributors and resellers, and Microsoft itself.

68. Microsoft has used its monopoly in the operating system market to dictate the terms and conditions under which OEMs are engaged, on Microsoft's behalf and as Microsoft's agent, to communicate Microsoft's offers of end-user licenses to purchasers of PCs. OEMs have no choice but to accede to Microsoft's demands. Because of Microsoft's monopoly, both the OEMs and Microsoft believe that there does not exist a single, commercially viable alternative to the pre-installation of Microsoft operating systems on PCs manufactured and sold by OEMs. Conclusions of Law, 87 F. Supp. 2d at 37. Because OEMs have no other viable choice, Microsoft effectively forced OEMs to pre-install Microsoft operating systems on their PCs and to jointly act with Microsoft to offer end-user licenses for acceptance or rejection by customers under terms strictly and exclusively dictated by Microsoft. As an example of Microsoft's

domination and control of the OEM distribution channel, Microsoft strictly limits the freedom of OEMs to add to, delete from, or modify the operating system, its start-up sequence, or the content and appearance of the Windows desktop.

69.     End-users can acquire Microsoft software licenses from the company by calling a 1-800 telephone number or accessing Microsoft's Internet Web site at "shop.microsoft.com."

70.     End-users were the targets and foreseeable victims of Microsoft's anti-competitive conduct alleged herein and have paid artificially-inflated prices for Microsoft's software licenses. Microsoft requires end-users who obtain Microsoft software pre-installed on a personal computer to enter into an end-user license agreement with Microsoft. Microsoft dictates the terms of agreements under which distributors and retailers are engaged, on Microsoft's behalf and as Microsoft's agent, to communicate Microsoft's offers of end-user licenses. These agreements provide, among other things, for a refund to be paid to the end-user of the cost of the operating system or applications software, as the case may be, if the end-user declines to enter into Microsoft's required license. The license also provides significant restrictions on the use of the software by the licensee and grants Microsoft certain rights and remedies against the licensee for breach of the license agreement.

71.     Contrary to software industry practice and what had been Microsoft's practices prior to the Class Period, end-users who purchased new PCs through the OEM distribution channel during the Class Period were anti-competitively (a) prevented by Microsoft from effectively returning the Microsoft operating system for a refund (notwithstanding the terms of Microsoft's end-user license), (b) prohibited by Microsoft from installing on their new PCs the Windows operating system on their existing PC, and (c) prohibited by Microsoft from re-selling on a stand-alone basis the Windows operating system products which they purchased with their

new PCs.

## GOVERNMENT ACTIONS AGAINST MICROSOFT

72.     In the early 1990's, the United States Department of Justice ("DOJ") investigated (and subsequently brought a complaint concerning) Microsoft's illegal and anti-competitive practices in the operating system market in *United States v. Microsoft*, Civ. No. 94-1564 (D. D.C., Petition filed July 15, 1994) ("*Microsoft I*"). The anti-competitive practices complained of in *Microsoft I* included Microsoft's requirement that OEMs enter into "per processor" license agreements which required OEMs to pay operating systems royalties to Microsoft on every machine the OEMs shipped regardless of whether the machine contained MS-DOS, another operating system from a competing developer (such as Digital Research's DR-DOS), or no operating system at all. Thus, the OEMs could only use a competing operating system if they were willing to pay twice—once to Microsoft and once to Microsoft's competitor. The DOJ complaint also challenged other anticompetitive provisions in Microsoft's OEM licenses.

73.     The United States District Court for the District of Columbia entered a final judgment in *Microsoft I* on August 21, 1995, which barred several anti-competitive terms in Microsoft's agreements with OEMs. Prohibited contract provisions included: "per processor" license provisions, license terms exceeding one year in length, provisions prohibiting or restricting OEMs from licensing or distributing non-Microsoft operating systems, provisions conditioning an OEM's license of one Microsoft operating system product upon the license of another Microsoft product or upon the OEM not licensing a non-Microsoft product, minimum commitment provisions, and provisions requiring royalty payments to Microsoft other than on a per-copy or per-system basis. As described in more detail below, Microsoft was able to devise other anticompetitive provisions in its OEM and other agreements that had the same

exclusionary effect as the conduct prohibited in the 1995 final judgment.

74.    In 1997, the United States sought to have Microsoft held in contempt for violating the 1995 final judgment, in large part due to Microsoft's requirement that OEMs license and distribute Microsoft's Internet Explorer browser as a condition for obtaining a license to Windows 95 ("*Microsoft II*").   Despite the Federal District Court's entry of a preliminary injunction on December 11, 1997, Microsoft publicly announced on December 15, 1997 that any OEM that did not agree to license and distribute Internet Explorer could not obtain a license to the current version of Microsoft's Windows operating system.

Subsequent proceedings led to a renewed complaint by the United States. On May 18, 1998, the DOJ, joined by twenty states, including Iowa, and the District of Columbia, filed suit against Microsoft alleging various antitrust violations by the company ("*Microsoft III*").   *Microsoft III* challenged Microsoft's efforts to protect its Windows monopoly from the threat posed by "middleware."   Because middleware could support alternative platforms or even become an alternative platform to which applications could be written, Microsoft understood the challenge this class of software posed to Microsoft's operating systems monopoly.   Indeed, according to the DOJ, Microsoft viewed certain middleware—including Netscape's Navigator web browser and Sun Microsystems' Java technologies—as the most significant threat to its operating systems monopoly at the time.

75.    The DOJ alleged that Microsoft, in order to protect its Windows monopoly from various middleware threats, engaged in a series of anti-competitive activities aimed at preventing widespread distribution of these middleware products.   Those activities included:  agreements tying other Microsoft software products to Microsoft's Windows operating system; exclusionary agreements which precluded companies from distributing, promoting or using products of

Microsoft's software competitors; and exclusionary agreements restricting the rights of companies to provide services or resources to Microsoft's software competitors. For eighteen months, the DOJ and Microsoft vigorously litigated the merits of the DOJ's allegations.

76.     On November 5, 1999, Judge Thomas Penfield Jackson released his Findings of Fact in *Microsoft III*, 84 F. Supp.2d 9 (D.D.C. 1999), based on the extensive evidence presented during the bench trial.   Judge Jackson's Findings of Fact concluded, *inter alia*, that "Intel-compatible PC operating systems" was a relevant market for antitrust purposes and that Microsoft—by virtue of its 90-percent-plus market share combined with high barriers to entry—held (and continues to hold) a monopoly in that market.   The Findings of Fact also catalogued an extensive list of anti-competitive activities by Microsoft directed primarily at Netscape Navigator and Sun's Java technologies, along with conduct aimed at other nascent middleware threats—including, but not limited to, Intel's Native Signal Processing, RealNetwork's Media Player and Apple's Quicktime.   Microsoft's conduct, according to the Findings of Fact, was aimed at preserving the "applications barrier to entry" which protected Microsoft's operating systems monopoly.

77.     On April 3, 2000, Judge Jackson issued his Conclusions of Law in *Microsoft III*, 87 F. Supp. 2d 30 (D.D.C. 2000), in which he stated, *inter alia*, that "Microsoft maintained its monopoly power [in the operating systems market] by anti-competitive means... in violation of" the antitrust laws, including the Iowa Competition Law, Iowa Stat. § 553.01 *et seq.* Conclusions of Law, 87 F. Supp. 2d at 35.

78.     In the remedy stage, proposals submitted to the court in *Microsoft III* by the DOJ asked the court to split Microsoft into two different companies—with one company retaining the Windows operating system business and the other taking the rest of Microsoft's business,

23

including software applications and Internet software.   The DOJ reorganization plan was recommended, in large part, to restrict Microsoft's wrongful exercise of its combined monopoly power over operating system and applications software, and to prevent it from continuing to leverage its monopoly power in the operating system market to exert control over and raise barriers to entry in the software applications markets, and thereby reinforce the applications barrier to entry in the operating systems market.

79.   On June 6, 2000, the *Microsoft III* court approved the DOJ proposal and directed that Microsoft be split into two separate companies.  However, the court stayed implementation of the divestiture order pending an appeal by Microsoft.

80.   On June 28, 2001, the United States Court of Appeals for the District of Columbia upheld the District Court's conclusions that Microsoft enjoyed monopoly power in the market for Intel-compatible PC operating systems and that Microsoft illegally maintained that monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and analogous state law (including the Iowa Competition Law).  According to the D.C. Circuit, Microsoft's illegal conduct included, *inter alia*: imposing overly-restrictive licensing terms on OEMs in order to inhibit the distribution of Netscape's Navigator browser; commingling Internet Explorer code with Windows so end-users could not remove the browser from the operating system; entering exclusive contracts with IAPs to restrict Netscape's access to those valuable distribution channels; threatening to cancel development of Microsoft Office for the Macintosh unless Apple Computer agreed to make Internet Explorer its default browser; creating a "polluted" version of Java and then deceiving Java developers into creating applications that would not properly function on platforms other than Windows; and coercing Intel into abandoning efforts to create certain cross-platform technologies. *Microsoft III*, 253 F.3d 34 (D.C. Cir. 2001).

81.    The Court of Appeals vacated the District Court's divestiture remedy in part because of modifications by the D.C. Circuit to Judge Jackson's liability determinations in the Conclusions of Law.  The D.C. Circuit remanded the matter to the District Court for further proceedings, including remedies hearings.  On November 1, 2002, Judge Colleen Kollar-Kotelly entered final judgments in the DOJ and state actions which largely tracked a proposed settlement entered into between Microsoft and the DOJ in November 2001.

82.    Notwithstanding the final judgment in *Microsoft III*, the economic effects of Microsoft's anti-competitive conduct alleged herein continue unabated.  Indeed, nothing in the final judgment required Microsoft to lower prices for its operating systems software or otherwise eliminate the embedded overcharge in the operating systems market resulting from years of monopolistic conduct, and there is no indication that Microsoft has undertaken such a price reduction of its own volition.  To the extent the final judgment has any effect in lowering the applications barrier to entry (and perhaps re-injecting competition in the operating systems market), any tangible impact on prices for operating systems is years away, at best.

83.    Moreover, the final judgment did not even terminate all of Microsoft's conduct held to be illegal by the D.C. Circuit.  For instance, Microsoft is not required under the final judgment to end its anti-competitive practice of commingling operating system and browser code. Microsoft has given no indication that browser and operating systems code does not continue to be commingled in its most recent operating systems releases: Windows XP Home Edition and Windows XP Professional.

84.    Microsoft's conduct has also been held to be in violation of the competition laws of the European Communities by the European Commission ("Commission").  The Commission is a politically independent institution which, among other duties and responsibilities, enforces

European Union ("EU") competition rules on restrictive business practices and abuses of monopoly power for the whole of the European Union when cross-border trade and competition are affected.

85. In December 1998, the Commission received a complaint from Sun Microsystems that Microsoft had refused to provide interface information necessary for Sun to be able to develop products that would be properly compatible with the ubiquitous Windows operating system, and hence be able to compete on an equal footing in the market for workgroup server operating systems. The Commission's investigation revealed that Sun was not the only company that had been refused this information by Microsoft, and that these non-disclosures by Microsoft were part of a broader strategy designed to foreclose competitors from the market.

86. In 2000, the Commission enlarged its investigation, on its own initiative, to study the effects of the tying of Microsoft's Windows Media Player with the company's Windows operating system.

87. On March 24, 2004, following a comprehensive investigation of Microsoft's conduct, the Commission concluded that Microsoft had violated the competition laws of the European Communities. In a 302-page decision, the Commission held that Microsoft had been in continual violation of Article 82 of the European Communities' competition laws and imposed a fine against Microsoft of 497,196,304 euros (roughly equivalent to US $613,000,000).

88. In its ruling, the Commission concluded that Microsoft had abused, and continues to abuse, its monopoly in the PC operating system market by (a) refusing to provide competitors producing workgroup server operating systems software technical information they need to interoperate with Microsoft's PC operating systems and (b) integrating its PC operating system code and its workgroup server code. The purpose and effect of Microsoft's actions, the

Commission declared, has been to foreclose competition among workgroup server operating system software and thereby further entrench its monopoly of the PC operating system market. The Commission further noted that these violations are ongoing.

89.     The Commission concluded that Microsoft has a monopoly of the world market for PC operating systems and that, as a result of its exclusionary conduct, now has a virtual monopoly of the workgroup server operating system market.   The Commission rejected Microsoft's repeated argument that it had an absolute right to withhold information about its operating system, even if to prevent rival applications from interoperating with Windows, and that to require such disclosure would eliminate its "incentive to innovate."

90.     The Commission also held that Microsoft had abused, and continues to abuse, its monopoly of the PC operating system market by tying its media player software to its operating system.  The purpose and effect of Microsoft's tying, the Commission determined, has been to foreclose competition in the media player software market and thereby further entrench its monopoly of the operating system market. The Commission further noted that these violations are ongoing.

## BACKGROUND

### The Road to Microsoft's Monopoly In the Operating System Software Market

91.     In 1981, Microsoft released the first version of its Microsoft Disk Operating System for Intel-compatible PCs, known as "MS-DOS." The system had a character-based user interface that required the user to type specific instructions at a command prompt in order to perform tasks such as launching applications and copying files.  When International Business Machines Corporation ("IBM") selected MS-DOS for pre-installation on its first generation of PCs, Microsoft's software became the dominant operating system for Intel-compatible PCs.

92.     In 1985, Microsoft began marketing an operating system for Intel-compatible PCs called Windows.  This software included a GUI, which enabled users to perform tasks by selecting icons and words on the computer monitor's screen with a mouse.  Windows 3.0, released in 1990, was the first version of Windows to gain widespread adoption in the market.

93.     In 1995, Microsoft introduced Windows 95, which Microsoft advertised was the first operating system for Intel-compatible PCs that had the same kinds of integrated features as the MacOS operating system for PCs manufactured by Apple Computer, Inc. ("Apple").  (Prior versions, while having some characteristics of an operating system, required the presence of DOS to run.)  In reality, however, Windows 95 was little more than Windows 4.0 running atop MS-DOS 7.0 (more like previous versions of Windows than like the Mac OS).  In June 1998, Microsoft launched its successor, Windows 98, followed later by Windows 98 SE and Windows Me.

94.     At the same time Microsoft was developing and marketing its consumer-oriented Windows products such as Windows 3.1 and Windows 95/98, Microsoft was also developing and marketing the Windows NT operating system.  Windows NT 3.1 was released in July 1993. According to Microsoft, "the desktop version [of Windows NT] was well received by developers because of its security, stability, and rich Microsoft Win32® application programming interface (API)."  Later versions of Windows NT included Windows NT 3.5 Workstation, Windows NT 4.0 Workstation, and Windows 2000 Professional.

95.     In October 2001, Microsoft released its most current version of the Windows operating system, dubbed Windows XP.  Two desktop versions of Windows XP are available: Windows XP Home Edition and Windows XP Professional (as well as Windows XP Media Center Edition, a "superset" of Windows XP Professional).  According to Microsoft: "Windows

XP is a unifying leap forward for desktop operating systems. With the release of Windows XP Home Edition and Windows XP Professional..., Microsoft succeeded in merging its two Windows operating system lines for consumers and businesses, uniting them around the Windows NT and Windows 2000 code base."

96.     Microsoft possesses—and at all relevant times has possessed—a dominant, stable, and increasing monopoly share of the market for operating systems for Intel-compatible PCs. Over the last decade, Microsoft's share of the market for operating systems for Intel-compatible PCs has exceeded 90 percent and, more recently, it has exceeded 95 percent.   It has been projected that Microsoft's share of the market will increase over the next few years.

97.     Microsoft's pricing behavior demonstrates that Microsoft possesses monopoly power in the operating systems market.   As the recent government action against Microsoft established, Microsoft did not even consider the prices of competitors' operating systems for Intel-compatible PCs when it set the price of Windows 98.  Findings of Fact ¶ 62.  Microsoft was able to exercise unfettered discretion in setting the price for the license of its Windows 98 upgrade product.   According to an internal Microsoft study from November 1997, Microsoft could have charged $49.00 for an upgrade to Windows 98, and there was no reason to believe that the $49.00 price would have been unprofitable for Microsoft.   The study, however, determined that a price of $89.00 would maximize revenues for Microsoft.  Findings of Fact ¶ 63. Because of its monopoly power, Microsoft was able to charge the higher price.  Moreover, Microsoft raised the price that it charged OEMs of Intel-compatible PCs for Windows 95, with few exceptions, to the same level as the price it charged for Windows 98 prior to its release. Findings of Fact ¶ 62.  In a competitive market, it would be expected that the price of an older operating system would stay the same or decrease upon the release of a newer, more attractive

version. Microsoft, however, was only concerned with inducing OEMs to install Windows 98 in favor of the older version. Microsoft would not have imposed this price increase if it were at all concerned that OEMs might shift their business to another vendor of an operating system for Intel-compatible PCs.

### Microsoft's Windows Monopoly: The Applications Barrier to Entry

98.     There are several high and strong barriers to entry into the market for operating systems for Intel-compatible PCs. Perhaps the most daunting barrier to entry is created by the number of software applications that must run on an operating system in order to make the operating system attractive to end users. As the District Court in *Microsoft III* found—and as the D.C. Circuit agreed—Microsoft's monopoly power in the operating systems market derives in part from the "applications barrier to entry." Microsoft went to great lengths (as established below) to destroy the competitive position of any software product that threatened to weaken or eliminate that barrier.

99.     The applications barrier to entry results from the "chicken and egg" nature of the demand for PC operating systems. Consumers tend to be more interested in an operating system for which there is a substantial library of existing software applications. The fact that a vastly larger number of applications have been written to run on Microsoft operating systems than on other PC operating systems has attracted consumers to Microsoft's operating system; end users assume that their interests in applications will be met as long as they use Microsoft's product.

100.     Software development is characterized by substantial economies of scale. The fixed costs of producing software, including applications, are very high. By contrast, marginal costs are very low. Moreover, much of the cost of developing software is "sunk"—once expended, such resources cannot be used for another purpose. The result of economies of scale