agreements prohibited OEMs from:

a.  Modifying or obscuring the sequence or appearance of any screens displayed by Windows from the time the user first begins the boot-up process with a new personal computer until the "Welcome to Windows" screens have run and the Windows desktop screen first appears;

b.  Modifying or obscuring the sequence or appearance of any screens displayed by Windows on all subsequent boot-ups unless the purchaser initiates some action to change the sequence;

c.  Displaying any content, including visual displays, sound, welcome or tutorial screens, until after the Windows desktop screen first appears;

d.  Modifying or obscuring the appearance of the Windows desktop screen, beyond a narrowly limited range of permitted changes; or

e.  Adding a screen that would automatically appear after the initial boot-up sequence or in place of the Windows desktop screen.

176.   These anti-competitive restrictions preserved the advantageous desktop position that Microsoft secured for Internet Explorer and other Microsoft or Microsoft-designated software.   The restrictions also foreclosed competing Internet browsers from securing preferential placement on PC desktops, and foreclosed OEMs from choosing among competing browsers on the merits.  The effect of these restrictions was significantly to restrict the access of competing browsers to the important OEM channel and thereby fortify Microsoft's personal computer operating systems monopoly.

177.   As described above, several OEMs (including MicronPC, Hewlett-Packard, and Gateway) requested that Microsoft allow them to provide new personal computer purchasers

with an alternative user interface, boot-up sequence, or initial or default screens.  Microsoft refused these requests.

178.   Microsoft recognized that its control over the desktop screen gave Microsoft a strategic advantage in the provision of software, advertising and promotion.  Microsoft intended by its anti-competitive restrictions to consolidate that power.

179.   As the D.C. Circuit recognized in *Microsoft III*, these exclusionary restrictions (with the minor exception of the prohibition against launching user interfaces that "automatically prevent[ed] the Windows desktop from ever being seen") were not reasonably necessary to further any legitimate, pro-competitive purpose and furthermore impaired competition in an unnecessarily restrictive way.

180.   Microsoft's exclusionary contracts thereby foreclosed Netscape from access to customers, and further impeded their ability to distribute Java and other software capable of eroding Microsoft's operating systems monopoly.  Such exclusionary conduct also suppressed the development of newer secure browsers.

### Contractual and Technological Bundling of Internet Explorer with Windows

181.   Internet Explorer is recognized by both Microsoft and the industry as a distinct product separate and apart from Windows.  For example:

a.   Microsoft has sold Internet Explorer separately at retail, distributed it separately through the Internet, and paid for it to be distributed separately;

b.   Microsoft has distributed Internet Explorer as a separate product through Internet Service Providers and other channels and has conditioned the access of numerous companies (*e.g.*, Internet Content Providers and Internet Service Providers) to Windows facilities on such companies' distribution of Internet Explorer as a

separate product;

c.    Microsoft and the industry have separately tracked browser market share and operating system software market share;

d.    Microsoft has bundled stand-alone versions of Internet Explorer with other application programs (*e.g.*, Word, Works, Encarta);

e.    Microsoft has promoted, and has enlisted others to promote, the distribution and use of Internet Explorer as a separate product;

f.    Internet Service Providers consider Internet Explorer to be a separate product from Windows and, recognizing the demand for a browser separate from the operating system software, Microsoft has deliberately marketed it as such to Internet Service Providers;

g.    Internet browsers and operating system software perform different functions; and

h.    Microsoft has marketed--and continues to market--Internet Explorer for non-Windows operating system software, including operating system software produced by Apple.  Indeed, Microsoft devoted substantial effort in developing these versions of its Internet Explorer in order to foreclose opportunities for non-Microsoft browsers to establish themselves).

182.    There is demand for Internet browsers that is separate from the demand for Microsoft's operating system software.  For example:

a.    Many personal computer users (who, of course, require an operating system) do not need or want a browser;

b.    For many customers, the forced inclusion of a browser with the operating system software is a significant negative—including corporate customers who do not

want their employees connected to the Internet and customers that would prefer a different browser. Microsoft has acknowledged that some sellers of personal computers and personal computer users want to be able to delete Internet Explorer from Windows and previously provided the ability, through the "Add/Remove" utility, for them to do so; and

c. Other personal computer customers want an up-to-date Windows operating system together with non-Microsoft browsers.

183. Microsoft recognized that it could not compete with Netscape on the merits. As Microsoft's Christian Wilfeuer wrote in February, 1997, Microsoft had concluded that it would "be very hard to increase browser share on the merits of [Internet Explorer] alone. It will be more important to leverage the [operating system] asset to make people use [Internet Explorer] instead of Navigator." To leverage its operating system, Microsoft tied the implementation of Windows 98 (and subsequent versions of Windows) with Internet Explorer, so that IE could not be simply uninstalled. Moreover, even if Netscape Navigator is chosen as a default browser, Windows 98 (and subsequent versions of Windows) is written to override the user's choice in certain circumstances. As Brad Chase of Microsoft wrote to his superiors near the end of 1995, "We will bind the shell to the Internet Explorer, so that running any other browser is a jolting experience."

184. Even before it bound Internet Explorer to Windows with "technological shackles," though, Microsoft began tying Internet Explorer to Windows with "contractual shackles." Microsoft unlawfully required OEMs, as a condition of obtaining licenses for the Windows 95 operating system, to agree to license and pre-install Internet Explorer on every Intel-compatible PC that they shipped with Windows 95 pre-installed. Windows' monopoly

position made it a commercial necessity for OEMs to pre-install Windows 95 on virtually all of the PCs they sold. Microsoft thereby unlawfully leveraged its operating system monopoly to require PC manufacturers to license and distribute Internet Explorer on every PC those OEMs shipped with Windows, with the purpose and effect of foreclosing Netscape's Web browser, which (as described above) threatened to erode the applications barrier to entry sustaining Microsoft's operating systems monopoly.

185.   Microsoft bundled its Internet Explorer software with Windows 95 not because Microsoft believed the market wanted only a bundled product but rather to foreclose choice by personal computer sellers and ultimately their customers.

186.   Microsoft recognized that such restrictions were necessary to build Internet Explorer's market share and to foreclose the important OEM channel to Navigator. By foreclosing personal computer choice, Microsoft substantially foreclosed Netscape from a significant channel of distribution, and as a consequence suppressed competition with the Windows operating system software monopoly.

187.   These exclusionary restrictions were not reasonably necessary to further any legitimate pro-competitive purpose and furthermore the restrictions impaired competition in an unnecessarily restrictive way. Microsoft has distributed—and continues to distribute—Internet Explorer separately from its Windows operating system software, and it is efficient for it to do so. Microsoft could also efficiently distribute or permit the distribution of Windows without Microsoft's Internet browser software.

188.   Recognizing that its contractual restrictions on OEMs "would not be sufficient in themselves to reverse the direction of Navigator's usage share... Microsoft set out to bind [Internet Explorer] more tightly to Windows 95 as a technical matter." Findings of Fact ¶ 160.

189. Microsoft designed Windows 98 (and subsequent versions of Windows) so that removal of Internet Explorer by OEMs or end users is operationally more difficult than it was in Windows 95. Microsoft undertook several measures to bind "Internet Explorer to Windows with... technological shackles." Conclusions of Law at 39. These included, *inter alia,* excluding Internet Explorer from the Add/Remove Programs utility in Windows and commingling code relating to browsing with other code in the same files so that any attempt to delete the files containing Internet Explorer would cripple the operating system.

190. Although it is nevertheless technically feasible and practicable to remove Microsoft's Internet Explorer browser software from Windows and to substitute other Internet browser software, OEMs were prevented from doing so by Microsoft's contractual tie-in. Microsoft has thus continued this practice begun with Windows 95, with the unlawful purpose and effect of foreclosing Netscape's Web browser, thereby preserving the applications barrier to entry sustaining Microsoft's operating systems monopoly. The net result of this unlawful activity is higher prices for Plaintiffs and members of the Classes.

**Exclusionary Agreements with Internet Access Providers (IAPs)**

191. Microsoft entered into anti-competitive agreements with major Internet Access Providers for the exclusive or nearly exclusive distribution of Internet Explorer.

192. Starting in early 1996, as a condition for placement of an IAP on the "Internet Connection Wizard" screens or the Online Services folder in Windows 95, Microsoft began to require Internet Access Providers to agree to deny most or all of their subscribers a choice of Internet browser.

193. Microsoft's restrictions on the ability of OEMs to modify the boot sequence or otherwise alter the appearance of Windows enhanced Microsoft's ability to provide preferential

placement on the desktop and in the boot-up sequence to various Internet Access Providers in return for those firms' commitments to give preferential distribution and promotion to Internet Explorer and to restrict their distribution and promotion of competing browsers.

194.   As a result, these restrictions further exclude competing Internet browsers from the most important channels of distribution, and are therefore other means by which Microsoft has used the virtual universality of its Windows operating system monopoly to maintain the applications barrier to entry that competing Internet browsers have threatened to erode by distributing Java and becoming platforms that could substitute for Windows.

195.   In its agreements with IAPs, Microsoft leveraged its operating system monopoly by imposing the requirements that the IAPs offer Microsoft's Internet Explorer browser primarily or exclusively as the browser they distribute; that they refrain from promoting or mentioning to their subscribers the existence, availability, or compatibility of any competing Internet browser; and that they use on their own Internet sites Microsoft-specific programming that makes those sites look better when viewed through Internet Explorer than when viewed through competing Internet browsers; that they eliminate links on their web sites from which their subscribers could download a competing browser over the Internet; that they include Internet Explorer as the only browser they ship with their access software (i.e., the software that enables a personal computer user to subscribe to the service) most or all of the time; and that they limit the percentage of competing browsers they distribute, even in response to specific requests from customers.

196.   Microsoft's agreements with Internet Access Providers also required the IAPs to use Microsoft-specific programming extensions and tools in connection with the IAP's own web sites. Web sites developed with these Microsoft-specific programming extensions and tools will consequently look better when they are viewed with Internet Explorer than with a non-Microsoft

browser.

197.   Under Microsoft's IAP contracts, the penalty for promoting a competing browser, for distributing a competing browser more than permitted by Microsoft, or for otherwise failing to provide preferential treatment for Microsoft's Internet browser, was deletion from the Windows desktop.  Even the largest Internet Access Providers were unwilling to risk this penalty.

198.   Microsoft recognized the importance to Internet Access Providers of favorable placement on Windows screens.  For example, Brad Silverberg (Microsoft's former Senior Vice-President of its Applications and Internet Client Group) described such placement as "a distribution facility" for service providers that is of "tremendous value to them."

199.   Approximately one-third of Internet browser users obtained their browsers from their service provider; hence Microsoft's exclusionary agreements with those firms substantially foreclosed Microsoft's browser competitors from a vital means of distribution.

200.   The exclusionary restrictions in Microsoft's IAP agreements were not reasonably necessary to further any legitimate procompetitive purpose and impaired competition in an unnecessarily restrictive way.

201.   Microsoft's exclusionary IAP contracts, expressly targeted at its primary Internet browser competitors, further foreclosed non-Microsoft browser developers from access to customers and further impeded their ability to distribute Java and other software capable of eroding Microsoft's operating systems monopoly.

### Microsoft's Predatory Response to Sun Microsystems' Java Technologies

202.   Sun Microsystems, Inc. announced in May 1995 that it had developed the Java programming language.  The inventors of Java intended the technology to enable applications written in the Java language to run on a variety of platforms with minimal porting.  This was a significant development because the easier it is for developers to port their applications to different operating systems, the more applications will be written for operating systems other than Windows.

203.   Microsoft executives almost immediately became deeply worried about the potential of Sun's Java technologies to diminish the applications barrier to entry protecting Microsoft's operating systems monopoly.  In May 1995, Netscape agreed to include a copy of Sun's Java runtime environment with every copy of Navigator, and Navigator quickly became the principal vehicle by which Sun placed copies of Java on the PC systems of Windows users.

204.   In 1996, senior executives at Microsoft became aware that the number of developers writing network-centric applications in the Java programming language had become significant and that Java was likely to increase in popularity among developers.  Microsoft therefore became interested in maximizing the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa.  Microsoft engaged in various anti-competitive acts to accomplish this purpose, including:

   a.     Microsoft discouraged developers from using Java.  In 1997, Sun added a class library called Remote Method Invocation ("RMI"), which allowed Java applications written upon it to communicate with each other in certain useful

ways. Microsoft's license agreement with Sun required Microsoft to offer RMI. However, because this would allow Java developers to make applications more portable, Microsoft took action to prevent access to RMI. Microsoft buried the RMI link in an obscure location and did not include an entry for it in the site's index. Referring to Java developers who might access Microsoft's site looking for RMI, a Microsoft employee wrote to his approving manager "They'll have to stumble across it to know it's there. . . . I'd say it's pretty buried.";

b.     Microsoft licensed and then corrupted Java, by creating Microsoft-specific Java development tools and a Windows-compatible Java runtime environment that made porting more difficult than with the Sun version of Java. Microsoft continued to refuse to implement Sun's RMI method until November 1998, when a court ordered it to do so;

c.     Microsoft discouraged business allies, such as Intel, from cooperating with Sun, threatening that cooperation would jeopardize the business relationship between Microsoft and the ally; and

d.     In agreements signed with ISVs in 1997 and 1998, Microsoft conditioned early Windows 98 and Windows NT betas, other technical information, and the right to use certain Microsoft seals of approval, on the agreement of those ISVs to use Microsoft's version of the Windows Java as the "default." Microsoft entered into an agreement with at least one ISV that explicitly required it to redistribute Microsoft's Java to the exclusion of any other.

Microsoft's anti-competitive attacks upon Java, coupled with its limitation of a primary distribution vehicle, Netscape Navigator, effectively eliminated the Java threat to the

applications barrier.

205.   Microsoft continues to engage in various anticompetitive acts designed to further eliminate competition in the operating systems market.   For instance, Microsoft refuses to distribute any implementation of the Java runtime on its Windows XP operating system.   Unless OEMs separately install a JVM, the first time that a consumer running Windows XP encounters a web page requiring a JVM, Windows XP generates a notice that in order to display the web page correctly, the user must download and install the Microsoft Windows-compatible Java runtime environment.   If the consumer then selects the download option, the user has automatically been directed to a Microsoft web site from which the Microsoft Windows-compatible Java runtime environment is downloaded and installed.

206.   Having illegally debilitated the vendor-independent Navigator/Java middleware platforms that threatened its PC operating system monopoly, Microsoft is now exploiting its illegal monopolies to leverage market share for its own middleware platform, one that, in sharp contrast to the Navigator/Java middleware platforms, is Microsoft specific.   Microsoft refers to its new Microsoft-specific middleware platform as the .NET framework.   When the potential of the Navigator and Java platforms to capitalize on the Internet paradigm became apparent, Microsoft was neither poised nor well-suited to provide a competitive alternative to those platforms.   Now that it has illegally crushed the threat poised by the Navigator and Java middleware platforms, and thereby bought itself years of time to clone much of the functionality of the Java platform, Microsoft has touted the belated introduction of its new .NET middleware platform as its most important initiative, one that will fundamentally transform its own business and the Internet in general.   Just as it developed the Windows platform on top of MS-DOS in order to encourage developers to write to the new platform, Microsoft now will provide the .NET

Framework as a middleware layer on top of Windows, and encourage developers to increasingly write their applications to this new platform, gradually obsolescing the Windows platform and transferring Microsoft's monopoly from the PC operating system to the middleware layer. Microsoft hopes to use its ill-gotten .NET market share to leverage market share in the increasingly important realm of server-based computing, a realm that currently poses the greatest threat to Microsoft's desktop hegemony.  By infusing .NET with Microsoft-specific interfaces and protocols shared by the Microsoft servers facilitating dynamic web services, Microsoft threatens to control, and render Microsoft-specific, the market for dynamic web services and other server-based computing.  Microsoft also hopes to leverage its .NET market power to increase its market share in the adjacent market of embedded devices.

### Streaming Media Technologies

207.    Just as it perceived a threat from web browsers, Microsoft also saw a threat from streaming media software.  As the district court found in *Microsoft III*:

> In 1997, senior Microsoft executives viewed RealNetworks' streaming [media] software with the same apprehension with which they viewed Apple's [QuickTime] playback software—as competitive technology that could develop into part of a middleware layer that could, in turn, become broad and widespread enough to weaken the applications barrier to entry [which protected Microsoft's operating systems monopoly].

Findings of Fact ¶ 111, 84 F. Supp. 2d at 37

208.    RealNetworks is a pioneer in the field of digital media, particularly streaming media—a technology for delivering audio and video content over networks like the internet.  In 1995, RealNetworks became the first company to offer commercially internet streaming media players and servers.  RealNetwork's digital media players have been available on various platforms, including Apple's MacOS, Hewlett-Packard's HP UX, Sun's Solaris, IBM's AIX, and

Linux.

209.    In response to the threat posed by RealNetworks' streaming media technologies, Microsoft utilized many of the same anticompetitive tactics that it employed against Netscape's Navigator.  In January 1999, Microsoft executive Anthony Bay sent Bill Gates an email outlining a plan for Microsoft to dominate the market for streaming media—and thereby protect its Windows operating system monopoly.   Mr. Bay recommended that Microsoft "reposition streaming media battle from NetShow versus Real to Windows versus Real" and "follow the [Internet Explorer] strategy wherever appropriate."

210.    As part of its anticompetitive campaign against RealNetworks, Microsoft has given away its Windows Media products or even paid customers to take them.  Microsoft has offered financial incentives to encourage OEMs to install Windows Media Player on their PCs. It has tied the Windows Media Server (recently renamed "Windows Media Services") to its Windows server operating system products.  Microsoft has also tied its Windows Media software to its Windows PC operating system

211.    Microsoft has also refused to provide RealNetworks with technical information concerning the Windows operating system that would allow RealNetworks to make its media player fully competitive with Microsoft's Windows Media Player.  For instance, Microsoft has refused to disclose, or delayed disclosing, the APIs and other technical information required for RealNetworks' software to make use of the Secure Audio Pathway or "SAP."  Microsoft has also disclosed needed technical information in a discriminatory manner.

212.    Microsoft has also engaged in anticompetitive conduct against Burst.com as part of its efforts to maintain the applications barrier to entry protecting its operating systems monopoly. Burst.com was the developer of core video streaming technology that would enable a

provider to perform faster-than-real-time transmissions of time-based media over networks. As it has done with other smaller competitors, Microsoft was determined to "embrace, extend and extinguish" Burst by, *inter alia*, misappropriating Burst's intellectual property.

### Microsoft's Predatory Response to Opera

213.    Opera Software, a Norwegian-based ISV, developed the Opera Web browser, a high-quality, multi-platform product for a wide range of platforms, operating systems and embedded Internet products. A version of the Opera Web browser is available for the Windows platform.

214.    In keeping with its efforts to undermine Navigator, Microsoft has engaged in an anti-competitive campaign against Opera as well. In October 2001, for example, users of the Opera Web browser—as well as other alternative non-Microsoft browsers such as Mozilla—discovered that they had been "locked out" from Microsoft's MSN website. Instead, users of non-Microsoft browsers were given the option of downloading a version of Microsoft's Internet Explorer.

215.    More recently, in February 2002, Microsoft began sending users of the Opera Web browser a faulty style sheet which determines the presentation of graphics and text in a browser window. When people using Opera 7 browser software visited MSN.com (which is published by Microsoft) some of the site content is obscured. Opera 7 received a style sheet very different from the style sheets used by the Microsoft and Netscape browsers. The Opera Web browser was explicitly instructed to move content off the side of its container, thus creating the impression that there is something wrong with Opera 7. Not only did the code sent to Opera users not work in Opera 7, it did not function in Microsoft's own Internet Explorer 6.

216.    On information and belief, Microsoft's anti-competitive actions directed at Opera

(consistent with its FUD campaigns against DR-DOS and others) were intended to create the belief among end users that the Opera Web browser was to blame for the problem. The actions were further intended to prevent the cross-platform Opera Web browser from gaining the critical mass necessary to pose a threat to the applications barrier to entry.

### Microsoft's Predatory Conduct In The Workgroup Server Market.

217.  As the District Court for the District of Columbia observed in November 2002, "the Court concludes that one of the technologies identified by Plaintiffs, server/network computing, has the capacity to function in a role akin to middleware, and thereby increase competition in the relevant [PC OS] market." Microsoft also recognized the threat posed by workgroup server operating systems and, in a manner essentially identical to its attacks on applications, middleware and PC operating system competitors, developed a strategy to monopolize the workgroup server market.

218.  Microsoft implemented a three-pronged strategy for eliminating competition in the workgroup server market. First, Microsoft used its logo and certification programs for its PC operating system to coerce developers to write applications that would also run on its workgroup server operating system. Second, Microsoft intentionally acted to lock out rivals like Sun and Samba from the workgroup server operating system market by refusing to disclose technical information necessary to interoperation and by degrading the limited interoperability that previously existed in the marketplace between Microsoft's PC operating system and non-Microsoft workgroup server operating systems. Third, Microsoft bundled critical networking functions and features into its PC operating system products, but then designed those functions and features so that customers cannot fully use that functionality unless they also purchase Microsoft's workgroup server operating systems. As a result, consumers could not substitute a

non-Windows server operating system if they wished to use all of the Windows PC functionality they purchased as part of their PC operating system. In short, Microsoft has designed its PC operating system monopoly products to require Microsoft workgroup server operating systems in order to access and utilize the full functionality contained in the PC operating system.

219. By intentionally denying non-Microsoft workgroup servers the same ability to interoperate with the functions and features of the PC operating system that are necessary and central to interoperation with workgroup servers, while making those same functions and features fully accessible only to Microsoft workgroup servers, Microsoft has increased the switching costs for consumers by increasing the products that must be replaced from the PC operating system alone to the PC operating system and every Microsoft device or product that connects to it. As Michael Tiemann, Chief Technology Officer with Red Hat, Inc.—a Linux developer—testified in the remedies proceedings in *New York v. Microsoft Corp.*, Microsoft's conduct in the workgroup server market raised barriers to Linux gaining acceptance on the PC desktop.

## MICROSOFT'S ANTI-COMPETITIVE ACTIVITIES IN THE APPLICATIONS SOFTWARE MARKETS

### Overview

220. Much of the anti-competitive activity described above affected competition not only in the operating systems market, but also in the relevant applications markets.

221. Microsoft also abused and leveraged its monopoly power in the operating systems market to gain unfair advantages in the relevant applications software markets.. As part of its anti-competitive campaign in those markets, Microsoft refused to provide competing software developers adequate technical disclosures about its operating systems. Given the prevalence of

Microsoft operating systems on the desktop—and the fact that Microsoft's own application developers were provided access to the technical underpinnings of MS-DOS and Windows, including "undocumented" APIs that were not made available to rival applications and middleware developers—such technical information was essential for applications developers to compete. Microsoft's anti-competitive conduct in adjacent applications markets not only resulted in Microsoft gaining additional monopolies in those markets, it also had the simultaneous effect of re-enforcing the applications barrier to entry, and thus strengthening Microsoft's operating systems monopoly.

222. Microsoft displaced the dominant spreadsheet program (Lotus 1-2-3) by engaging in a calculated effort beginning in 1989 to convince Lotus Development Corporation to write its next spreadsheet version to run on OS/2 without disclosing that Microsoft had already decided to abandon OS/2 in favor of MS-DOS and Windows. When Microsoft finally disclosed its intentions concerning OS/2, Microsoft had already gained a first-mover advantage in spreadsheet applications on the Windows platform.

223. Furthermore, Microsoft's anti-competitive efforts to take market share from Navigator were designed to protect Microsoft's dominance in office suites and word processing software on the Windows platform (in addition to protecting Microsoft's operating system monopoly). Microsoft understood that the growth in the popularity of email as a means of communication within and between businesses and other organizations greatly diminished such organizations' interest in word processing programs such as Word and (by extension) office suites such as Office. Microsoft's unlawful attack on Navigator's market share thus was also aimed at preventing Netscape from using Navigator as a beachhead on the desktop to push email as a new "killer app" that would threaten traditional office suite applications such as word

processors.

### Developers' Need for Access to Microsoft's Operating System Code

224.    As a result of its unlawfully gained monopoly in the operating systems market, Microsoft had control of ISVs to compete in the market for Intel-compatible PC applications software, including word processors and spreadsheet software.

225.    By unreasonably refusing, limiting and manipulating its actual and potential competitors' access to technical specifications for its operating systems products, while preferentially or freely granting its own applications developers such access (and through its other unlawful acts alleged herein), Microsoft unreasonably and unlawfully advantaged itself in the relevant applications software markets alleged herein, and as a consequence acquired and/or maintained monopolies in those markets, and unlawfully inflated the prices it charged for the relevant applications software.

226.    Implicitly recognizing the need for competing applications developers to have access to its operating system code on an equal basis with its own applications developers, some Microsoft executives falsely claimed that it had created a "Chinese wall" that prevented its own applications software developers from having preferential access to its operating system source code or to the employees working on that code.

227.    Microsoft could have easily provided timely access to its operating system specifications to competing software vendors and others in the normal course of business, but chose instead to preclude, limit or delay such access in order to acquire and/or maintain monopoly power in the relevant applications software market.

228.    Microsoft has unlawfully exploited its control over its de facto standard operating systems to maintain and/or perpetuate its monopolies in the relevant applications software

markets.

229.   Microsoft, through its control over these de facto standards and through monopolies in the relevant markets, has denied Plaintiffs and members of the Classes the fundamental right to product choice, and has forced Plaintiffs and the members of the Classes to pay supra-competitive prices and suffer other damages for the relevant applications software products.

### Microsoft's Abuse and Leveraging of its Operating Systems Monopoly

230.   Microsoft has pursued a strategy of using its power in the market for Intel-compatible PC operating systems as leverage, through anti-competitive acts and marketing and technical links, to acquire and/or maintain monopoly power in the relevant applications software markets. The anti-competitive acts used by Microsoft to acquire and/or maintain its monopoly power in the operating system market also have allowed Microsoft to target and monopolize the applications software markets for Intel-compatible PC word processing and spreadsheet software.

231.   Microsoft has obtained power in the relevant applications markets by, among other things, giving its own applications software developers early and complete access to the revised code developed in successive versions of its monopoly operating systems. To compete with Microsoft's applications software, non-Microsoft developers must have timely access to Microsoft's operating system APIs, as well as to other operating system information.

232.   To maintain its dominance over, and supra-competitive prices in, the applications software markets, Microsoft has engaged in the following anti-competitive conduct, among others:

a. Microsoft failed to timely disclose the APIs for MS-DOS and Windows to software developers who needed such information to create applications software compatible with Microsoft's operating system while using those undocumented APIs in its own applications software;

b. Microsoft impeded competing ISV's development efforts by providing them with incomplete operating system code, forcing them to accept restrictive licenses, and barring them from attending supposedly open software development conferences at Microsoft;

c. Furthermore, Microsoft impeded competing ISV's development efforts by denying promised promotional and marketing support, forcing distributors and dealers to exclude ISV's from their promotions, and denying ISV's promised access to Windows' user mailing lists;

d. Microsoft intentionally made its operating system incompatible with or difficult to operate with competitors' applications software;

e. Microsoft threatened OEMs that they would receive a license for Windows only if they agreed not to offer competitors' non-Microsoft applications software;

f. Microsoft threatened OEMs that it would increase the price for its operating systems if the OEMs distributed non-Microsoft applications software;

g. Microsoft threatened to withhold from OEMs market development funds if the OEMs distributed non-Microsoft applications software;

80

h.   Microsoft threatened OEMs that Microsoft would withhold technical support for Microsoft's operating systems, including Windows, if the OEMs offered competitors non-Microsoft applications software; and

i.   Microsoft used other exclusionary license terms, such as "per system" licenses, with OEMs.

233.   In its Findings of Fact, the District Court in *Microsoft III* gave specific examples of Microsoft's anti-competitive behavior in regard to its applications software, including its attempts to preclude IBM's installation of its own Lotus SmartSuite bundle of office productivity software on PCs manufactured by IBM. Findings of Fact at ¶¶ 115-132. Specifically, the District Court found that "[w]hen IBM refused to abate the promotion of those of its own products that competed with Windows and Office, Microsoft punished the IBM PC Company with higher prices, a late license for Windows 95, and the withholding of technical and marketing support." Findings of Fact at ¶¶ 116, 118-131.

### "Misdirection" of Development Efforts Towards OS/2 Instead of Windows

234.   In the early 1990s, Lotus 1-2-3 had the dominant share of the Intel-compatible PC spreadsheet software market. In 1994, Microsoft engaged in a calculated effort to persuade Lotus to write its next version of Lotus 1-2-3 to run on OS/2 rather than Windows. At the very time that Microsoft was engaged in those efforts, however, it had already decided for itself to abandon any further development efforts for OS/2 and to focus instead on further developing Windows. Microsoft withheld this critical decision from Lotus.

235.   Microsoft's deception was successful: Lotus wrote its next spreadsheet version for OS/2, thereby misdirecting huge sums of money in virtually worthless development efforts. Microsoft timely released its next spreadsheet version to run on Windows and took substantial

market share from Lotus.

### OLE and OpenDoc

236.    By the late 1980s, various software developers, including Lotus and Word Perfect, had begun working on developing technology that would allow computer users to assemble information from multiple sources into a single document.  At the same time, Microsoft was working on developing its own proprietary compound document technology that became known as object linking and embedding ("OLE").

237.    In 1990, Microsoft invited Lotus and other developers to begin discussions aimed at defining an industry standard for communicating between applications.  Notwithstanding this invitation, though, Microsoft went ahead and unilaterally released its proprietary OLE technology.  Had Lotus or Word Perfect known of Microsoft's intentions, the companies could have developed and shipped their products earlier with the linking technology they had started developing in 1989.

238.    Microsoft subsequently revised its OLE technology pursuant to requests from its Excel developers without timely releasing those revisions to competing developers.  As a result, Microsoft's Excel developers had the opportunity for input and early knowledge of the resulting modifications that were unavailable to Microsoft's competitors.  Microsoft's competitors suffered delays of many months as they were forced to rewrite their own applications to make them perform under the OLE revisions.  Those delays before Lotus and Word Perfect could ship OLE-enabled products harmed the reputations of those developers, limited consumer choice, and enabled Microsoft to charge supra-competitive prices.

239.    Microsoft vigorously opposed an alternative open standard called "OpenDoc" which would have freed developers from Microsoft's attempts to dictate the way applications

software was developed. OpenDoc would also have reduced the costs to developers of porting their applications to other platforms. Microsoft punished competitors who supported the open standards by, among other things, providing those competitors "special" versions of the beta software that lacked key information necessary for development of software products running on Windows. Furthermore, Microsoft forced software developers to sign non-disclosure agreements that barred them from receiving information on Windows 95 if they did not support Microsoft's OLE.

### Microsoft's Predatory Acts Specifically Targeted at Netscape and Java

240. Netscape's browser, as already noted, threatened to weaken the applications barrier to entry that protected Microsoft's monopoly in the operating system market. Microsoft also recognized, moreover, that Navigator posed a dangerous threat to its applications software monopoly, particularly office suites and word processors. As one Microsoft executive wrote:

> Netscape is using their position with the browser as a foothold onto the desktop to push e-mail and collaboration as the new killer applications. Any Office Suite in the near future will have mail as its core component. As e-mail use becomes pervasive in organizations, it will replace Word (and by extension Office) as the most critical end user app in organizations.... Netscape is working hard to offer a compelling application development platform, which if successful, will greatly diminish corporation's interests in our Office products.... The threat of continued low mail client share in organizations and with consumers is that our competitors gain control of the desktop, where they can switch existing Office users to their solutions, sell upgrades, and drive server share with a cohesive client-server solution.... In summary, we must keep our focus on browser share. This is central to the success of Windows and central to the success of Office. By focusing on IE today, we not only secure the desktop and secure future Windows sales, but also gain a user base that we can upgrade to Outlook then Office.

241. Moreover, if the browser and Java innovations described above succeeded, Microsoft would lose the competitive advantage of owning the interface with its Windows operating system software. Were it not for the exclusionary conduct by Microsoft set forth

above, word processing and spreadsheet software applications that compete with Microsoft Word and Excel could be written for the open Java platform, and not be limited to Microsoft's operating system software. As a consequence, Microsoft would lose its capacity to exclude its Word and Excel competitors.

242.   Microsoft's predatory acts directed at Navigator, therefore, were designed not just to protect Microsoft's operating system monopoly, but also its monopolies in the word processing and offices suites markets.

### Microsoft's Restrictions on Boot-up Sequence and Screens to Protect the Application Software Monopolies

243.   Microsoft's boot-up and desktop licensing agreements, as set forth above, have the purpose and effect of also suppressing application software competition in addition to the suppression of browser and Java innovation.

244.   Such agreements entrench the Windows monopoly of the relevant markets for personal computer word processing and spreadsheet software by raising distribution barriers to entry by competing sellers of word processing and spreadsheet software.

### Microsoft's Anti-competitive Use of Its Office Suite Monopoly

245.   Microsoft uses its control of the office productivity suite market to protect its PC operating system monopoly. Because office productivity suites are the primary way in which the majority of users interact with their PC, Microsoft Office is a strategically important weapon that Microsoft wields to maintain and expand its monopoly. Office productivity suites constitute a critical basis for the application barrier to entry protecting Microsoft's PC operating system monopoly.

246. By controlling these critical applications, Microsoft controls whether they are ported to competing platforms. If a company other than Microsoft controlled Office, it would be interested in porting its application suite to as many platforms as possible, assuming it was economically rewarding to do so. By contrast, if Microsoft ported Office to competing operating systems like Solaris or Linux, it would remove a critical part of the applications barrier protecting its PC operating system monopoly. Thus, Microsoft has refused to port Office to competing platforms in order to illegally maintain its monopoly, or it has used Office, in the case of the Macintosh operating system, to exact anticompetitive agreements in exchange for continued support on competing platforms.

247. Because Microsoft has had unique access and knowledge of the Windows APIs necessary for the development of office productivity suite applications, while denying competitors the same degree of access to such information, Microsoft was able to place its implementations at a significant competitive advantage as a result of its monopoly power. By providing Microsoft developers working on Office with earlier and better access to changes to the Windows APIs, Microsoft has advantaged Office over competing products like Corel's WordPerfect Office, IBM/Lotus's SmartSuite, or Sun's StarOffice.

248. By controlling Office, Microsoft also controls the file formats generated by these applications. To maintain its monopoly position and decrease competition, Microsoft has adopted Microsoft-specific file formats, thereby obstructing competitors' abilities to interoperate with such files. Consequently, competing office productivity suites, like Sun's StarOffice, are unable to read or duplicate these Microsoft-specific file formats in the same manner as Microsoft's Office. As a consequence, for example, a word processing document saved in Microsoft's standard Word format cannot be manipulated using StarOffice in the same manner

that it can be manipulated using Microsoft's Word program. By precluding full interoperability with competing office productivity applications, Microsoft obstructs competition.

249. Microsoft also uses its control of Office to create technical ties and dependencies that force consumers to purchase additional Microsoft workgroup server products, including Microsoft Exchange Server, Microsoft Internet Information Server, and Microsoft SQL Server. In order to effectively use all of Office's functionality in a networked client/server environment, a consumer must purchase these additional Microsoft products. As a result, if a firm later wishes to switch its office productivity suite or operating system, it will incur increased switching costs because it necessarily will have purchased and implemented not just Office, but a plethora of other Microsoft products as well. This interlocking web of technical ties and dependencies is intentionally designed by Microsoft to raise the barriers to entry protecting its monopoly positions by significantly raising switching costs. As distributed computing continues to become increasingly important, Microsoft's ability to exploit these ties and dependencies to drive additional server product sales only increases.

250. Microsoft also has used product pricing and bundling of Office itself to disadvantage competing products and maintain and expand the scope of its office productivity suite.

251. Microsoft also disadvantages office productivity applications by tightly integrating the applications bundled in Microsoft Office to ensure that competing productivity applications cannot provide the same set of functionality as the Microsoft programs.

## Microsoft's Practices Of Mischaracterizing
## And/Or Withholding Of Data And Other Evidence

252.   On information and belief, Microsoft has mischaracterized or withheld accounting data and other evidence, thereby failing to comply with the law.

253.   On or about June 3, 2002 the Securities and Exchange Commission imposed a final cease and desist order, consented to by Microsoft, which directed Microsoft to cease and desist from certain practices.  Microsoft agreed that it violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act and Rules 126-20, 13a-1 and 13a-13 promulgated thereunder.  Microsoft violated such provisions by maintaining undisclosed reserves, accruals, allowances and liability accounts that were not in conformity with generally accepted accounting principles and/or lacked proper documentation for those accounts as required by federal securities laws.  The effect of such unlawful practices was to misstate assets and income to shareholders and the public.

254.   On information and belief, Microsoft has tampered with evidence relevant to Plaintiffs and Class members' claims.  Microsoft executives have instructed employees to delete material email and/or other evidence despite pending investigations and litigation.  For example, in Burst.com's lawsuit against Microsoft, Burst.com alleged that Microsoft implemented various institutionalized practices to make certain that incriminating documents and e-mail were not retained on Microsoft back-up servers or employee desktops.

255.   Microsoft's failure to preserve relevant documents and other evidence has harmed the ability of Plaintiffs and Class members to prove their claims in this case.

## CONSUMER HARM

256.   Microsoft's exclusionary and restrictive practices described herein have caused significant harm to Plaintiffs and the members of the Classes by increasing the price they have paid for Microsoft's operating systems and relevant applications software above competitive levels and/or by denying them a free choice in a competitive market, as well as the benefits of software innovation.

257.   By virtue of its monopolization of the relevant markets, Microsoft has succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.  Its resulting monopoly power has enabled Microsoft to price its operating system and relevant applications software virtually without regard to the prices of competing software.  Sellers of personal computers and distributors of Microsoft products have passed these monopoly prices onto consumers, including particularly to the Class members.

258.   Microsoft's supra-competitive prices have given Microsoft profit margins for the products at issue many times the rates for other firms in the software industry.  Microsoft's return on equity has consistently been significantly higher than other firms in the software industry.

259.   Microsoft's supra-competitive prices and extraordinary profits are not the result of superior products or competition on the merits.  Instead, Microsoft has been able, at Class members' financial expense, artificially to inflate its profits only by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant markets for personal computer operating, word processing and spreadsheet software.

260.   Plaintiffs and the members of the Classes, as consumers in the markets for operating system and applications software, were within that area of the economy endangered by the breakdown of competitive conditions caused by Microsoft's unlawful conduct. Plaintiffs and the Class members were foreseeable and intended victims of Microsoft's monopolization, and their injury was inextricably intertwined with Microsoft's exclusionary and illegal conduct.

261.   The antitrust violations of Microsoft do not arise from a single isolated transaction, or even a series of transactions. Microsoft's antitrust violations, as described herein, constitute a repeated, continuous course of numerous transactions that fundamentally shaped the markets for operating system and applications software such that, for all reasonable purposes, it may fairly be said that Microsoft's unlawful conduct became embedded in these markets.

262.   Indeed, the supra-competitive price charged by Microsoft for its operating system and relevant applications software had become embedded in those markets well before the beginning of the Class Period.

263.   Over the many years of its continuous unlawful conduct, Microsoft has maintained a captive OEM channel that functions as Microsoft's distributor for the large majority of all Microsoft operating system and applications licenses to end-users of PCs, with the remainder of Microsoft's licenses reaching end-users through the "finished goods" channel, which includes large established retailers, distributors and resellers, and Microsoft itself. These OEMs and other distributors of Microsoft's operating system and applications software products do not, when acting in that capacity, suffer the supra-competitive cost and degradation of product. Instead, because of the highly competitive nature of these distribution channels and the

imbedded nature of Microsoft's supra-competitive prices, the anti-competitive overcharges imposed by Microsoft at the top of the distribution chain are passed through to end users of Microsoft's software, including Plaintiffs and the Class members.

264.  Given the ongoing nature of the unlawful conduct of Microsoft and the embedded nature of that conduct in the distribution system for Intel-compatible PC operating system and applications software, the absence of a class action remedy for Plaintiffs and the Class members would likely lead to the absence of any monetary sanction against Microsoft under the laws of the State of Iowa.  In light of the relationship between OEMs and Microsoft as alleged and the fact that OEMs have elected not to sue Microsoft, there is absent any risk of duplicative recovery.  In any event, to the narrow extent such duplication may exist, apportionment can reasonably be accomplished.

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

265.  Any applicable statutes of limitation have been equitably tolled by Microsoft's affirmative acts of fraudulent concealment, suppression, and denial of the true facts regarding the existence of the monopolistic and anti-competitive practices at issue herein.  Such acts of fraudulent concealment included intentionally covering up and refusing to publicly disclose critical internal memoranda, product development plans and other reports of anti-competitive practices.  Through such acts of fraudulent concealment, Microsoft was able to actively conceal from the public for years the truth about Microsoft's anti-competitive practices, thereby tolling the running of any applicable statutes of limitation.  Moreover, Microsoft still refuses to this day to take full responsibility for its actions, vigorously denying all liability or even the existence of monopolistic conduct.  By pleading certain of Microsoft's specific illegal acts, Plaintiffs do not intend to exclude from consideration at trial other illegal acts that Microsoft has taken and is

taking to maintain its unlawful monopolies to the substantial and continuing detriment of Iowa consumers.

## COUNT 1

266.    Plaintiffs reallege the preceding paragraphs as if set forth fully herein.

267.    As described above, beginning before the commencement of the Class Period and continuing to the present, Microsoft attempted to and did establish, maintain and/or use a monopoly of trade or commerce within the State of Iowa for the purpose of excluding competition and/or controlling, fixing or maintaining prices in the markets for operating systems for Intel-compatible PCs and for word processing and spreadsheet software.

268.    There are significant barriers to entry in the market for operating systems and applications software for Intel-compatible personal computers.

269.    Some of the specific acts engaged in by Microsoft to acquire and maintain its monopoly power in the Iowa market are described above. Such acts, and other acts, have unreasonably restricted competition in the relevant markets, and as a result Microsoft has monopoly power in those markets.

270.    Microsoft's monopoly power in those markets was willfully and unlawfully acquired and maintained.

271.    Pursuant to such acts by Microsoft to exclude competition, Microsoft has suppressed product innovation and has licensed its products to end users without regard to competition, at a monopoly price in excess of what Microsoft would have been able to charge in a competitive market. Microsoft's illegal conduct has also harmed Plaintiffs and members of the Classes by significantly limiting the range of choices that a free market would have provided to them. Certain innovative products and technologies that would have truly benefited consumers

never occurred or were prevented from reaching the market because such products and/or technology did not coincide with Microsoft's self-interest.

272.    Microsoft has reaped and continues to reap enormous profits by virtue of its unlawful conduct.

273.    As a direct result of Microsoft's conduct, Plaintiffs and members of the Classes incurred the supra-competitive price charged by Microsoft for their use of Microsoft operating system and relevant applications software and suffered additional damages from, *inter alia*, being denied a free choice in a competitive market as well as the benefits of software innovation, as more fully set forth herein. By asserting specific types of damages, Plaintiffs and members of the Classes do not intend to exclude from their request for recovery any damages permitted them under Iowa law for Microsoft's illegal conduct. The conduct described in the preceding paragraphs constitutes the establishment, maintenance or use of a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices in violation of § 553.5, Code of Iowa 2001.

274.    Plaintiffs and the members of the Classes are entitled to recover their damages under § 553.12, Code of Iowa, 2001.

## COUNT 2

275.    Plaintiffs reallege the preceding paragraphs as if set forth fully herein.

276.    As described above, beginning before the commencement of the Class Period and continuing to the present, Microsoft and others entered into an illegal contract, combination or conspiracy in unreasonable restraint of trade in the relevant markets at issue herein, in violation

of the Iowa Competition Law, Iowa Stat. § 553.4.

277.   Microsoft has reaped and continues to reap enormous profits by virtue of its unlawful conduct.

278.   As a direct result of Microsoft's conduct, Plaintiffs and members of the Classes incurred the supra-competitive price charged by Microsoft for their use of Microsoft operating system and relevant applications software and suffered additional damages from, *inter alia*, being denied a free choice in a competitive market as well as the benefits of software innovation, as more fully set forth herein.. By asserting specific types of damages, Plaintiffs and members of the Classes do not intend to exclude from their request for recovery any damages permitted them under Iowa law for Microsoft's illegal conduct.

279.   Plaintiffs and the members of the Classes are entitled to recover their damages under § 553.12, Code of Iowa, 2001.

WHEREFORE, Plaintiffs, individually and on behalf of each Class, pray for judgment and relief against Microsoft as follows:

A.   An order of this court certifying this action to proceed as a class action with Plaintiffs as proper class representatives;

B.   Plaintiffs and the members of the Microsoft Operating Systems Software Class and the Microsoft Applications Software Class recover their damages, as follows:

i.   the overcharges;

ii.   damages for the lack of free choice among competing products and the denial of benefits of software innovation;

iii.   damages for security breaches caused in whole or in part by Microsoft's illegal conduct; and

     iv.    additional damages proved at trial;

all in an amount to be determined at trial, plus exemplary damages equal to twice the damages they have sustained, and will sustain, as a result of the violations alleged herein, pursuant to § 553.12, Code of Iowa 2001;

    C.    Plaintiffs and the members of the Classes recover reasonable attorneys' fees and costs for pursuing this claim;

    D.    Plaintiffs and the members of the Classes recover interest as allowed by law; and

    E.    Plaintiffs and members of the Classes receive such other relief as the Court deems just in the premises.

## JURY DEMAND

    COMES NOW Plaintiffs and demand a trial by jury of all counts alleged in their Petition.

_[signature]_

Roxanne Barton Conlin
**Roxanne Conlin & Associates, P.C.**
600 Griffin Building
319 Seventh Street
Des Moines, Iowa 50309
Phone: (515) 283-1111
Fax: (515) 282-0477


Richard M. Hagstrom
**Zelle, Hofmann, Voelbel, Mason & Gette LLP**
500 Washington Avenue South, Suite 4000
Minneapolis, Minnesota 55415
Phone: (612) 339-2020
Fax: (612) 336-9100

**ATTORNEYS FOR PLAINTIFFS AND ALL OTHERS SIMILAR SITUATED**

Copy to:

Edward Remsburg
Ahlers & Cooney, P.C.
100 Court Avenue
Suite 600
Des Moines, IA  50309

Brent B. Green
Bradley C. Obermeier
Duncan, Green, Brown & Langeness
400 Locust Street, Suite 380
Des Moines, IA  50309

David B. Tulchin
Joseph E. Neuhaus
Sullivan & Cromwell
125 Broad Street
New York, New York 10004

Steve W. Berman
Hagens Berman
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101

Charles B. Casper
Montgomery, McCracken, Walker
  & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Thomas W. Burt
Richard Wallis
Steven J. Aeschbacher
Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was
served upon all parties to the above cause to each of the attorneys
of record herein at their respective addresses disclosed on the
pleadings on _____ 20___

By:  ☐ U.S. Mail        ☐ FAX
     ☐ Hand Delivered   ☐ Overnight Courier
     ☐ Certified Mail   ☑ Other: _email_

Signature _____

95

296570v3