03/09/2000 11:37 FAX 515 243 2149     AHLERS LAW FIRM

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| JOB COMES and<br>COMES VENDING, INC., | NO. CL000087311 |
| Plaintiffs, | CL 87311 |
| vs. | |
| MICROSOFT CORPORATION,<br>a Washington corporation, | PETITION |
| Defendant. | |

COMES NOW Plaintiffs and for their complaint against Defendant Microsoft

Corporation ("Microsoft"), Plaintiffs allege on behalf of themselves and all others similarly

situated that:

## SUMMARY OF THIS ACTION

1.    This is a class action for damages and other relief to which Plaintiffs and all

others similarly situated are entitled due to Microsoft's unlawful pricing of its Windows 98

operating system for Intel-based personal computers.

2.    For the purposes of this action, the following terms have the meanings stated and

explained.

(a)    A "personal computer," or "PC," is a digital information processing device

designed for use by one person at a time.  A PC consists of the central processing components of

a microprocessor and main memory, and mass data storage, usually a hard disk. A typical PC

system consists of a PC, peripheral devices including a monitor, a keyboard, a mouse, and a

1



EXHIBIT
A

03/02/2000 11:37 FAX 515 243 2149     AHLERS LAW FIRM                    004

printer, and an "operating system." PC's, which include desktop and laptop models, are

distinguished from more powerful, more expensive computer systems known as "servers," which

are designed to provide data, services, and functionality through a digital network to multiple

users.

      (b)    An "operating system" is a software program that controls the allocation and use

of computer resources, such as central processing unit time,

main memory space, disk space, and input and output channels. The operating system is also

referred to as a "platform." The operating system also supports the

functions of other software programs, called "applications," that perform particular tasks for the

PC's user, such as word processing, spread sheet design and use, and database management.

      (c)    An "Intel-based personal computer" is one designed to function with Intel

Corporation's 80x86/Pentium families of microprocessors, or with compatible microprocessors

manufactured by Intel Corporation or other firms. Intel-based personal computers are the

dominant type of personal computer sold and used in the United States and the State of

Anywhere.

      3.    At all times relevant, Microsoft has possessed monopoly power, meaning the

power to control price or exclude competition, in the market for operating systems for Intel-

based personal computers.

      4.    At all times relevant, Microsoft has unlawfully and willfully maintained its

monopoly power by anticompetitive and unreasonably exclusionary conduct.

      5.    Well aware of its unlawfully and willfully maintained monopoly power, and in

unlawful exercise of that monopoly power, Microsoft has knowingly, flagrantly, and with

impunity licensed its Windows 98 operating system for Intel-based personal computers, without regard to competition, at a monopoly price in excess of what Microsoft would have been able to charge in a competitive market.

6. Plaintiffs and all others similarly situated own or lease Intel-based personal computers.

7. Plaintiffs and all others similarly situated use Windows 98 as the operating system for their Intel-based personal computers. As a precondition to their first use of Windows 98, Plaintiffs and all others similarly situated were compelled to accept and agree to an end user license directly from Microsoft, pursuant to the terms of which Microsoft dictated, and Plaintiffs and all others similarly situated agreed, that Windows 98 was "licensed, not sold."

8. As end user licensees of Microsoft as to its Windows 98 operating system, Plaintiffs and all others similarly situated incurred the monopoly price charged by Microsoft for their use of Windows 98.

9. Plaintiffs and all others similarly situated are therefore entitled to damages according to proof as to the difference between a competitive price and the monopoly price that they incurred as end user licensees for their use of Windows 98. Plaintiffs believe that the difference between a competitive price and the monopoly price they incurred is less than $75.00.

## THE PARTIES

10. Plaintiff Comes Vending, Inc. is a corporation duly organized and existing under the laws of the State of Iowa. Its principal offices are located at 1285 Thomas Beck Road in Des Moines, Polk County, Iowa.

11. Plaintiff Joe Comes is a citizen and resident of Polk County, Iowa.

3

12.    Plaintiffs Comes Vending, inc. and Joe Comes purchased a Gateway Solo Computer directly from the Gateway, Inc. The Gateway Solo Computer came with Windows 98 pre-installed. As a pre-condition to using Windows 98, Plaintiffs became end-users licensees of Microsoft as to Windows 98. Joe Comes and Comes Vending, Inc. registered its ownership of the licenses and the following registration number:

        00899-0EM-0073344-18574

with Microsoft by electronic mail and by that means gave Microsoft their electronic mail address and state of residence.

13.    Microsoft is a for-profit corporation organized and existing under the laws of the State of Washington. Microsoft's principal place of business is located at One Microsoft Way, Redmond, Washington. Since its inception, Microsoft has focused primarily on developing and licensing computer software. Microsoft is the leading supplier of operating systems for personal computers. Microsoft markets and licenses its Windows 98 operating system for Intel-based personal computers throughout the United States, including the State of Iowa. Microsoft is authorized to conduct, and in fact does conduct, business in Iowa. The facts regarding Microsoft that are set forth below had a direct effect in the State of Iowa on the monopoly price that Plaintiffs and all others similarly situated incurred as end user licensees of Windows 98.

## NON-REMOVABILITY

14.    The claims asserted in this action do not arise under the Constitution, laws or treaties of the United States, and therefore the Federal courts do not have subject matter jurisdiction of this action under 28 U.S.C. § 1331.

15.    The amount in controversy for each plaintiff does not exceed $75,000.  Therefore the Federal courts do not have subject matter jurisdiction under 28 U.S.C. § 1332.  See Snow v. Ford Motor Co., 561 F.2d 787 (9th Cir. 1977).

16.    As the Federal courts do not have subject matter jurisdiction over the claims asserted herein, this action is not subject to removal to the Federal courts under 28 U.S.C. § 1441.

## CLASS ACTION ALLEGATIONS

17.    The Class is defined as follows: All end user licensees of Windows 98 residing in the State of Iowa as to whom Microsoft has an electronic mail address that is computer-accessible by Microsoft. Plaintiffs Comes and Comes Vending, Inc. are both members of the Class as thus defined.

18.  Plaintiffs are informed and believe, and on that basis allege, that the membership of the class is well in excess of 20,000, the exact number being known to Microsoft. The Class is therefore so numerous that joinder of all members is impracticable.

19.  There are questions of law and fact common to the Class. Such common questions include:

(a)    whether Microsoft has, at all times relevant, possessed monopoly power in the market for operating systems for Intel-based personal computers;

(b)    whether Microsoft has unlawfully and willfully maintained its monopoly power by anticompetitive and unreasonably exclusionary conduct;

(c)    whether Microsoft knowingly and with impunity licensed its Windows 98 operating system for Intel-based personal computers, without regard to competition, at a

5

monopoly price in excess of what Microsoft would have been able to charge in a competitive market;

(d)     whether the alleged conduct by Microsoft violates Chapter 553, Code of Iowa, 1997;

(e)     whether the members of the Class are entitled to damages based on the difference between a competitive price and the monopoly price that they incurred as licensees for their use of Windows 98.

20.  As set forth above, the claims of the Plaintiffs are typical of the claims of the Class.

21.  The Plaintiffs will fairly and adequately protect the interests of the Class.

22.  It is further appropriate to proceed with this action on behalf of the Class because:

(a)  the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Microsoft;

(b)  adjudications with respect to individual members of the Class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(c)  the questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this action

(d)     Plaintiffs are appropriate class representatives whose claims are typical of the class. The Plaintiff have retained lawyers who are experienced litigators.  Included in the group is very

6

substantial class action experience and expertise. The lawyers have agreed to advance the costs of the out-of-pocket expenses of this litigation and have the ability to do so.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

23. For the purposes of this action, the relevant product market consists of operating systems for Intel-based PCs. At all relevant times, no other product has duplicated or fully substituted for the operating system. The complex interactions among operating system software, applications software, and the hardware attached to the PC are such that, at all relevant times, an operating system written for a non-Intel type of microprocessor typically will not work on another type of microprocessor without significant modification. Accordingly, original computer equipment manufacturers (commonly referred to as "OEM's") and PC users do not consider an operating system that runs a non-Intel-based PC to be an effective substitute for an operating system that runs an Intel-based PC.

24. The geographic market for operating systems for Intel-based PCs is worldwide, but the relief sought in this action is limited to the Class in the State of Iowa.

25. In 1981, Microsoft released the first version of its Microsoft Disk Operating System for Intel-based PCs, known as "MS-DOS." The system had a character-based user interface that required the user to type specific instructions at a command prompt in order to perform tasks such as launching applications and copying files. When International Business Machines Corporation ("IBM") selected MS-DOS for pre-installation on its first generation of PCs, Microsoft's software became the dominant operating system for Intel-based PCs.

7

03/02/2000 11:38 FAX 515 243 2149     AHLERS LAW FIRM

26. In 1985, Microsoft began marketing an operating system for Intel-based PCs called "Windows." This software included a graphic interface, which enabled users to perform tasks by selecting icons and words on the computer monitor's screen by using a mouse. Although originally a user interface functioning in conjunction with MS-DOS, Windows eventually became something more in the nature of a truly independent operating system.

27. In 1995, Microsoft introduced Windows 95, which Microsoft advertised was the first operating system for Intel-based PCs that had the same kinds of integrated features as the Mac OS operating system for PCs manufactured by Apple Computer, Inc. ("Apple"). Windows 95 was extraordinarily popular with OEMs and PC end users. In June 1998, Microsoft launched its successor, Windows 98. As of that time, more than ninety percent of new Intel-based PCs had been shipped with a version of Windows pre-installed. Beginning in 1995, and continuing to the present, Intel-based PC OEMs have had no commercially reasonable alternative to Microsoft operating systems for the PCs that they distribute.

28. Microsoft possesses, and at all relevant times has possessed, a dominant, stable, and increasing share of the market for operating systems for Intel-based PCs. Over the last decade, Microsoft's share of the market for operating Systems for Intel-based PCs has exceeded ninety percent. For the last two years, Microsoft's share of that market has been at least ninety-five percent. It has been projected that Microsoft's share of the market will increase over the next few years.

29. Microsoft's pricing behavior demonstrates that Microsoft possesses monopoly power in the market for operating systems for Intel-based PCs. Microsoft did not even consider the prices of competitors' operating systems for Intel-based PCs when Microsoft set the price of

Windows 98. Moreover, Microsoft raised the price that it charged OEMs of Intel-based PCs for Windows 95, with few exceptions, to the same level as the price it charged for Windows 98 prior to its release. In a competitive market, it would be expected that the price of an older operating system would stay the same or decrease upon the release of a newer, more attractive version. Microsoft, however, was only concerned with inducing OEMs to install Windows 98 in favor of the older version. Microsoft would not have imposed this price increase if it were at all concerned that OEMs might shift their business to another vendor of an operating system for Intel-based PCs.

30.  As a consequence of its monopoly power in the market for operating systems for Intel-based PCs, Microsoft was able to exercise unfettered discretion in setting the price for the license of its Windows 98 upgrade product, the operating system that Microsoft licenses to existing end user licensees of Windows 95. A Microsoft internal study dated in November 1997 establishes that Microsoft could easily have charged $49.00 for an upgrade to Windows 98. There is no reason to believe that the $49.00 price would have been unprofitable for Microsoft. The study, however, determined that a price of $89.00 would maximize revenues for Microsoft. Because of its monopoly power, Microsoft charged the higher price.

31.  The facts set forth in paragraphs 26 and 27, above, came to light during the course of the consolidated trial of United States v. Microsoft Corporation and New York v. Microsoft Corporation, Civil Action Nos. 98-1232(TPJ) and 98-1233(TPJ), in the United States District Court for the District of Columbia. The evidentiary record of that trial closed on 'June 24, 1999. Beginning in or about September 1999, Microsoft began licensing its Windows 98 Second Edition as an upgrade of Windows 98 for a price of $19.95.

9

32.  There are several high and strong barriers to entry into the market for operating systems for Intel-based PCs. Perhaps the most daunting barrier to entry is created by the number of software applications that must run on an operating system in order to make the operating system attractive to end users. End users want to be able to have a large number of applications available to them. Most applications are currently written to run on Windows. It would be prohibitively difficult, time-consuming, and expensive to create an alternative operating system that could run the programs that run on Windows. Any potential new operating system entrant therefore faces a high and strong barrier to successful entry into the market for operating systems for Intel-based PCs. This barrier to entry is often referred to as the "applications barrier to entry."

33.  At all relevant times, and as Microsoft has consistently been aware, Microsoft's dominant share of the market for operating systems for Intel-based PCs has been the principal contributing force in creating and maintaining the applications barrier to entry into that market. As Microsoft has also consistently been aware, it is directly due to the applications barrier to entry into that market enjoyed by Microsoft that it was able to establish the price for Windows 98 licenses as set forth in paragraphs 28 and 29, above.  Microsoft established the price for Windows 98 licenses, without regard to competition, at a monopoly price in excess of what Microsoft would have been able to charge in a competitive market. Plaintiffs and the other members of the Class paid those monopoly prices.

34.  The experiences of IBM and Apple, Microsoft's only significant operating system rivals in the 1990s, demonstrate the strength of the applications barrier to entry that Microsoft created and enjoys.

10

03/02/2000 11:40 FAX 515 243 2149          AHLERS LAW FIRM

35. IBM introduced its OS/2 Warp operating system for Intel-based PCs in late 1994, and spent tens of millions of dollars in an effort to attract independent software vendors to develop applications for OS/2 Warp, and in a related effort to reverse-engineer key aspects of the Windows coding. Despite these efforts and expenditures, IBM could not obtain either significant market share or independent software vendor support for OS/2 Warp. The enormous Windows installed base made it prohibitively expensive for IBM to continue attempting to attract enough software developer support to challenge Windows. Although at its peak OS/2 Warp ran approximately 2,500 applications and had ten percent of the market for operating systems for Intel-based PCs, IBM ultimately determined that the applications barrier to entry that Microsoft created and enjoys prevented effective competition against Windows 95. For that reason, in 1996 IBM ceased its efforts to convince independent software vendors to write applications for OS/2 Warp. IBM now targets OS/2 Warp at a market niche, consisting mainly of banks that use particular kinds of application that run on OS/2 Warp. That IBM has abandoned any effort to compete with Windows is demonstrated by the fact that IBM prices OS/2 Warp at more than twice the price of Windows 98.

36. Apple has also been unable to compete effectively with Windows, providing another example of the strength of the applications barrier to entry that Microsoft has created and enjoys. Although Apple's Mac OS operating system supports more than 12,000 applications, even an inventory of that magnitude is not sufficient to enable Apple to present a significant percentage of users with a realistic substitute for Windows. The absence of a large installed base of Mac OS reinforces the disparity between the applications made available for Mac OS and those made available for Windows, further inhibiting Apple's sales. The applications barrier to entry that

11

Microsoft has created and enjoys has therefore prevented the Mac OS operating system from constraining Microsoft's ability to control the price for Windows 98.

37.  At all relevant times, Microsoft has acted aggressively and willfully to maintain the applications barrier to entry into the market for operating systems for Intel-based PCs, and has thereby acted to maintain its monopoly pricing power in that market, by anticompetitive and unreasonably exclusionary conduct. All of Microsoft's unlawful actions in maintaining the applications barrier to entry have had as their ultimate purpose, and have had the resulting effect of, enabling Microsoft unlawfully to exercise its monopoly power by licensing its Windows 98 operating system for Intel-based PCs, without regard to competition, at a monopoly price in excess of what Microsoft would have been able to charge in a competitive market, to the injury of Plaintiffs and the Class.

38.  The most significant potential threat to Microsoft's operating system monopoly, which exists because of the applications barrier to entry that Microsoft created and enjoys, is not from a direct attack by existing or new operating systems. Instead, as Microsoft itself has expressly recognized, the applications barrier to entry could be seriously eroded, and Microsoft's operating system monopoly correspondingly threatened, by new software products that may support, or even themselves become, alternative platforms to which applications can be written, and which can be used in conjunction with multiple operating systems, including but not limited to Windows.

39.  At all relevant times, Microsoft has acted aggressively to protect its Windows monopoly against any such potential competitive threats to the applications barrier to entry that Microsoft created and enjoys, and to leverage Microsoft's operating system monopoly into other

12

software markets, by engaging in a plethora of anticompetitive and exclusionary activities.
Microsoft's conduct includes agreements tying other Microsoft software products to Microsoft's
Windows operating system; exclusionary agreements precluding companies from distributing,
promoting, buying, or using products of Microsoft's software competitors, including even
potential competitors; and exclusionary agreements restricting the right of companies to provide
services or resources to Microsoft's software competitors, including even potential competitors.
Microsoft's consistent and coordinated pattern of acts have had no valid or sufficient business
purpose, and made no business sense for Microsoft except as a means of protecting its operating
system monopoly.

40.  Microsoft recognized at least as early as May 1995 that the Internet presented one of
the most serious threats to the applications barrier to entry, and thereby to Microsoft's operating
system monopoly.  At that time, Microsoft's Chairman Bill Gates described the Internet as "the
most important single development to come along since the IBM PC was introduced in 1981."
The means of accessing the Internet with a PC is known as a "browser," which is a specialized
software program that allows a PC user to locate, access, display, and manipulate all of the
content and all of the applications software located on the Internet's World Wide Web. At all
times relevant, Microsoft has marketed and licensed an Internet browser known as "Internet
Explorer" (sometimes referred to below as "IE").

41.  Mr. Gates warned his subordinate executives in May 1995 that a competing Internet
browser posed a serious threat to the applications barrier to entry and thus to Microsoft's
operating system monopoly.  "A new competitor 'born' on the Internet is Netscape.  Their
browser [known as Navigator] is dominant, with a 70% usage share, allowing them to determine

13

which network extensions will catch on. They are pursuing a multi-platform strategy where they move the key API [applications programming interface] into the client to commoditize the underlying operating system."

42. Internet browsers that compete with Microsoft's Internet Explorer by themselves then posed, and have continued to pose, a serious competitive threat to Microsoft's operating system monopoly. The applications barrier to entry, consisting of the large number of software applications that will run on the Windows operating system but not on other operating systems, has precluded other potential software developers of operating systems from competing with Windows. If, however, application programs could be written to run on multiple operating systems, then competition in the market for operating systems for Intel-based PCs could be reinstated. Browser technology, in combination with a new programming language known as "Java," has held out exactly that prospect, a threat which was altogether ominous for Microsoft when Mr. Gates issued his warning in May 1995.

43. Java was designed to permit applications written in its language to be run on multiple operating systems for Intel-based PCs, including but not limited to Windows. Given that facility, Java-based applications are not restricted to Windows as their only operating system, as was previously the case with other applications. That daunting restriction has constituted the very foundation of the applications barrier to entry into the market for operating systems for Intel-based PCs that Microsoft has created and enjoys. The distribution of Java through Internet browsers that compete with Microsoft's Internet Explorer therefore threatened to eliminate the applications barrier to entry protecting Microsoft's monopoly of operating Systems for Intel-based PCs, and correspondingly threatened to obliterate Microsoft's power to license its

14

Windows operating systems for Intel-based PCs at monopoly prices, without regard to competition, in excess of what Microsoft would be able to charge in a competitive market.

44. Non-Microsoft Internet browsers are the most significant means of distributing Java technology to end users. Microsoft has recognized that the widespread use of browsers other than its own Internet Explorer threatens to increase the distribution and use of Java, and in so doing threatens Microsoft's operating system monopoly by weakening the applications barrier to entry. Microsoft therefore determined aggressively to use its Internet Explorer to counter the threat to Microsoft's operating system monopoly presented by Java. A presentation to Microsoft Chairman Bill Gates on January 5, 1997, discussing how to respond to the Java threat, emphasized "Increase IE share" as a key Microsoft strategy.

45. Microsoft separately recognized that Netscape's Navigator browser was itself a "platform" to which many applications were being written. If Navigator thrived, more and more applications would be written using Navigator as a platform. Because Navigator could be run on any Intel-based PC operating system, the success of this alternative platform also threatened to reduce or eliminate the applications barrier to entry protecting Microsoft's operating system monopoly. This is the threat that Microsoft's Chairman Bill Gates referred to in his May 1995 communication quoted in paragraph 40, above, as the threat that Netscape would "commoditize" the operating system.

46. To respond to the competitive threat to Microsoft's operating system monopoly posed by Netscape's Navigator browser, both as a platform and as a vehicle for distributing Java, Microsoft determined to squash that competitive threat by embarking on an extensive and aggressive campaign to market and distribute Microsoft's own Internet Explorer browser.

15

Microsoft described that campaign as a "jihad" to win the "browser war." Microsoft embarked on that "jihad" because winning the "browser war" was essential to Microsoft's ability to preserve the applications barrier to entry that protects Microsoft's operating system monopoly, and to preserve Microsoft's corresponding power to license its Windows operating systems for Intel-based PCs at monopoly prices, without regard to competition, in excess of what Microsoft would be able to charge in a competitive market.

47. A monopolist's weapon of choice is its monopoly power. Microsoft therefore undertook to use its operating system monopoly power as the means of obliterating the threat that Netscape's Navigator posed to the applications barrier to entry which sustains that monopoly power. As of February 1997, Microsoft had concluded that it would "be very hard to increase browser share on the merits of IE 4 alone." Instead, Microsoft determined that: "It will be more important to leverage the OS [operating system] asset to make people use IE instead of Navigator."

48. Microsoft first attempted to eliminate competition from Netscape by soliciting an express horizontal agreement not to compete. In May 1995, Microsoft executives met with Netscape executives for the purpose of inducing Netscape not to compete with Microsoft and to divide the browser market. Microsoft proposed that it would be the sole supplier of browsers for use with Windows 95 and successor operating systems, and that Netscape would be the sole supplier of browsers for operating systems other than Windows 95 and its successors. Netscape refused to participate in Microsoft's patently unlawful scheme.

49. Microsoft thereupon set about to exclude Netscape and other browser rivals from access to the distribution, promotion, and resources that they needed in order to be competitive.

16

To be successful, browser rivals would need to be able to offer their browser products to OEMs and PC users at a level sufficiently pervasive to facilitate the widespread distribution of Java, or to facilitate their browsers becoming an attractive programming platform in their own right. As has been shown above, those two potential scenarios would, either alone or in combination, erode the applications barrier to entry that is the basis of Microsoft's operating system monopoly. Microsoft was determined not to let either scenario come to pass.

50. Microsoft sank hundreds of millions of dollars into the testing and promotion of Internet Explorer, and then distributed that product without separate charge. Such actions would only make sense to a predatory monopolist. As if any further explanation of that behavior were necessary, Microsoft's Vice President in charge of the Platforms Group told industry executives: "We are going to cut off [Netscape's] air supply. Everything they're selling, we're going to give away for free." And Microsoft's Chairman Bill Gates boasted in June 1996: "Our business model works even if all [of Microsoft's] Internet software is free. ... We are still selling operating systems. What does Netscape's business model look like? Not very good."

51. In addition to free distribution, Microsoft did whatever it took to make sure significant market participants distributed and used Internet Explorer instead of Netscape's Navigator, including paying some customers to take IE and using its Windows monopoly power to induce others to do so. Mr. Gates was blunt in seeking the support of Intuit, a significant application software developer, as he reported in a July 1996 Microsoft e-mail:

> "I was quite frank with him [Scott Cook, Chairman of Intuit] that if he had a favor we could do for him that would cost us something like $1M to do that in return for switching browsers in the next few months I would be open to doing that."

17

52. Microsoft has also charged different OEMs different prices for their Windows licenses, depending on the degree the individual OEMs have complied with Microsoft's wishes in pursuing its "jihad" in the "browser war." Among the five largest OEMs, Gateway and IBM, which in various ways have resisted Microsoft's efforts to enlist the them in its efforts to preserve the applications barrier to entry into the market, pay higher prices for their OEM licenses than Compaq, Dell and Hewlett-Packard, which have pursued less contentious relationships with Microsoft.

53. Microsoft unlawfully required PC OEMs, as a condition of obtaining licenses for the Windows 95 operating system, to agree to license and pre-install Internet Explorer on every Intel-based PC that they shipped with Windows 95 pre-installed. Windows' monopoly position made it a commercial necessity for OEMs to pre-install Windows 95 on virtually all of the PCs they sold. Microsoft thereby unlawfully leveraged its operating system monopoly to require PC manufacturers to license and distribute Internet Explorer on every PC those OEMs shipped with Windows, with the purpose and effect of foreclosing competing Internet browsers that, as described above, threatened to erode the applications barrier to entry sustaining Microsoft's operating systems monopoly.

54. Microsoft designed Windows 98 so that removal of Internet Explorer by OEMs or end users is operationally more difficult than it was in Windows 95. Although it is nevertheless technically feasible and practicable to remove Microsoft's Internet browser software from Windows 98 and to substitute other Internet browser software, OEMs are prevented from doing so by Microsoft's contractual tie-in. Microsoft has thus continued this practice begun with Windows 95, with the purpose and effect of foreclosing competing Internet browsers that

18

threatened to erode the applications barrier to entry sustaining Microsoft's operating systems monopoly.

55. In its continuing "jihad" to win the "browser war" and thus preserve the applications barrier to entry, Microsoft has gone to the extreme of controlling the content of the computer screen that the PC's end user sees. Microsoft has misused its Windows operating system monopoly by requiring Intel-based PC OEMs to agree, as a condition of acquiring a license to the Windows operating system, to adopt the uniform "boot-up" sequence and "desktop" screen that Microsoft has dictated. This sequence determines the screens that every user sees upon turning on a Windows-based PC. Microsoft's exclusionary restrictions also forbid, among other things, any changes by an OEM that would remove from the PC any part of Microsoft's Internet Explorer software. OEMs are also prohibited by Microsoft from adding to the PC a competing browser in any more prominent or visible way than the way Microsoft requires Internet Explorer to be presented.

56. The same monopoly-based restrictive agreements also maintain, and enhance the importance of Microsoft's ability to provide preferential placement on the desktop and in the boot-up sequence to various Internet Service Providers (known as "ISPs") and Internet Content Providers (known as "ICPs"), in return for those firms' commitments to give preferential distribution and promotion to Internet Explorer and to restrict their distribution and promotion of competing browsers.

57. As a result, these restrictions further exclude competing Internet browsers from the most important channels of distribution, and are therefore other means by which Microsoft has used the virtual universality of its Windows operating system monopoly to maintain the

applications barrier to entry that competing Internet browsers have threatened to erode by distributing Java and becoming platforms that could substitute for Windows.

58. In its agreements with ISPs, Microsoft has leveraged its operating system monopoly by imposing on ISPs the requirements that they offer Microsoft's Internet Explorer browser primarily or exclusively as the browser they distribute; that they refrain from promoting or mentioning to their subscribers the existence, availability, or compatibility of any competing Internet browser; and that they use on their own Internet sites Microsoft-specific programming that makes those sites look better when viewed through Internet Explorer than when viewed through competing Internet browsers.

59. Microsoft's "jihad" in waging the "browser war" has certainly had independent, significant effects in the market for Internet browsers, but Plaintiffs and the Class do not seek any independent relief in this action based on the effects of Microsoft's anticompetitive conduct on that market. Instead, the damages to Plaintiffs and the Class stem from their payment of monopoly prices that Microsoft charged for its Windows 98 operating system for Intel-based PCs. In that context, Microsoft's unlawful and anticompetitive behavior in pursuing its "jihad" against competing Internet browsers has had the purpose and effect of unlawfully maintaining Microsoft's monopoly power in the market for operating systems for Intel-based PCs, by preventing competing Internet browsers from distributing Java and also becoming platforms, consequences which Microsoft itself acknowledged would erode the applications barrier to entry that Microsoft well knows protects its monopoly.

60. Microsoft, like other for-profit corporations, measures its own performance in terms of profits as a function of revenues. Ultimately, therefore, Microsoft's "jihad" had as its purpose

20

maintaining Microsoft's power to charge monopoly prices for its Intel-based PC operating systems. That Microsoft's unlawful acts of monopolization have been successful in staving off the threat to the applications barrier to entry posed by competing Internet browsers is evidenced by the fact that Microsoft did not even need to consider the prices of competitors' operating systems, let alone the prices of competitors' Internet browsers, when Microsoft set the price for Windows 98.

61.  As has been shown above, Microsoft has willfully and unlawfully wielded its monopoly power to preserve that very power. In the course of doing so, and in willful and unlawful exercise of its monopoly power, Microsoft has knowingly licensed its Windows 98 operating system for Intel-based PCs, without regard to competition, at a monopoly price in excess of what Microsoft would have been able to charge in a competitive market. Plaintiffs and all members of the Class suffered antitrust injury to their business or property by paying those monopoly prices. Plaintiffs and all members of the Class are entitled to compensatory damages based on the difference between the monopoly prices they paid and the price that Microsoft would have been able to charge in a competitive market.

## COUNT 1 - ANTITRUST

62.  The plaintiffs reallege the preceding paragraphs as if set forth fully herein.

63.  As described above, beginning sometime prior to June, 1998 and continuing thereafter, Microsoft attempted to and did establish, maintain and/or use a monopoly of trade or commerce within the State of Iowa for the purpose of excluding competition and/or controlling,

21

fixing or maintaining prices in the market for operating systems for Intel-based personal
computers.

64.     There are significant barriers to entry in the market for operating systems for
Intel-based personal computers.

65.     The specific acts engaged in by Microsoft to acquire and maintain its monopoly
power in the Iowa market for operating systems for Intel-based computers are described above.
Such acts have unreasonably restricted competition in this market, and as a result, Microsoft
owns a dominant share of such market.

66.     Microsoft's monopoly power in such market was willfully and flagrantly acquired
and maintained.

67.     Pursuant to such attempt by Microsoft to exclude competition with Windows 98,
Microsoft licensed its Windows 98 operating system to end users without regard to competition,
at a monopoly price in excess of what Microsoft would have been able to charge in a competitive
market.

68.     As end user licensees of Microsoft as to its Windows 98 operating system, the
plaintiffs and all others similarly situated incurred the monopoly price charged by Microsoft for
their use of Windows 98.

69.     As a direct result of Microsoft's conduct, the plaintiffs and all others similarly
situated incurred the monopoly price charged by Microsoft for their use of Windows 98.

70.     Microsoft has reaped and continues to reap enormous profits by virtue of its
wrongful conduct.

22

71.    Said conduct constitutes the establishment, maintenance or use of a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices in violation of §553.4 and §553.5, Code of Iowa 1997.;

72.    Plaintiffs are or will become entitled to recover their damages under Chapter 553.17, Code of Iowa, 1997.

73.    Microsoft's unlawful conduct will continue unless the relief prayed for in this Complaint is granted.

WHEREFORE, the Plaintiffs pray as follows:

A.    For an injunction preventing the aforestated unlawful conduct.

B.    Damages to the plaintiffs and all others similarly situated in the amount of the difference between a competitive price and the monopoly price that they incurred as end user licensees for their use of Windows 98.

C.    Punitive damages in an amount sufficient to punish Defendant and deter it and others from similar conduct in the future.

C.    Reasonable attorney's fees and costs to the plaintiffs and all others similarly situated for pursuing this claim.

D.    Interest as allowed by law.

E.    That the Court order such other relief as the Court deems just.


**JURY DEMAND**

COMES NOW Plaintiffs and demand a trial by jury of all counts alleged in their Petition.

23

03/02/2000 11:43 FAX 515 243 2149          AHLERS LAW FIRM

Roxanne Barton Conlin
Roxanne Conlin & Associates, P.C.
The Plaza - Suite 5
300 Walnut Street
Des Moines, Iowa 50309
Phone: (515) 282-3329
Fax: (515) 282-0318
ATTORNEY FOR PLAINTIFF

24